**BEFORE THE UNITED STATES JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION**

**IN RE: BENZOYL PEROXIDE**            **MDL NO. _____**
**"BPO" MARKETING AND SALES**
**PRACTICES LITIGATION**


_____/


<u>**BRIEF IN SUPPORT OF PLAINTIFFS' MOTION FOR TRANSFER OF ACTIONS
PURSUANT TO 28 U.S.C. § 1407 FOR COORDINATED OR CONSOLIDATED
PRETRIAL PROCEEDINGS**</u>

## TABLE OF CONTENTS

Page

**TABLE OF CONTENTS** ........................................................................................... i

**TABLE OF AUTHORITIES** ..................................................................................... ii

**BACKGROUND** ......................................................................................................2

    I.    BPO Degrades to Benzene Under Normal Use and Handling ........................ 2

    II.   BPO Litigation Procedural History .............................................................. 6

    III.  Attempts at Informal Coordination ............................................................ 10

**ARGUMENT** ..........................................................................................................**10**

    I.    Centralization is Warranted for These Cases ............................................. 10

    II.   Informal Coordination is Impractical ......................................................... 14

    III.  There Are Several Appropriate Venues for These Cases .............................. 15

**CONCLUSION** ........................................................................................................**16**

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*In re Actos Prods. Liab. Litig.*,
840 F. Supp. 2d 1356 (J.P.M.L. 2011) ........................................................................ 16

*In re Ahern Rentals, Inc., Trade Secret Litig.*,
481 F.Supp.3d 1355 (J.P.M.L. 2020) ......................................................................... 17

*In re Bair Hugger Forced Air Warming Devices Prods. Liab. Litig.*,
148 F. Supp. 3d 1383 (J.P.M.L. 2015) ....................................................................... 15

*In re: Biomet M2A Magnum Hip Implant Prods. Liab. Litig.*,
896 F. Supp. 2d 1339 (J.P.M.L. 2012) ....................................................................... 15

*In re ClassicStar Mare Lease Litig.*,
528 F. Supp. 2d 1345 (J.P.M.L. 2007) ....................................................................... 19

*In re: Dollar Gen. Corp. Motor Oil Mktg. & Sales Pracs. Litig.*,
190 F.Supp.3d 1361 (J.P.M.L. 2016) ......................................................................... 18

*In re: Farxiga (Dapagliflozin) Prods. Liab. Litig.*,
273 F. Supp. 3d 1380 (J.P.M.L. 2017) ................................................................... 15, 16

*In re Mirena IUS Levonorgestrel-Related Prods. Liab. Litig. (No. II)*,
249 F.Supp.3d 1357 (J.P.M.L. 2017) ......................................................................... 18

*In re MLR, LLC, Patent Litig.*,
269 F. Supp. 2d 1380 (J.P.M.L. 2003) ....................................................................... 15

*In re: Prempro Prods. Liab. Litig.*,
254 F. Supp. 2d 1366 (J.P.M.L. 2003) ....................................................................... 16

*In re Proton Pump Inhibitor Prods. Liab. Litig. (No. II)*,
261 F. Supp. 3d 1351 (J.P.M.L. 2017) ....................................................................... 15

*In re Sigg Switzerland (USA), Inc., Aluminum Bottles Mktg. & Sales Practices Litig.*,
682 F. Supp. 2d 1347 (J.P.M.L. 2010) ....................................................................... 20

*In re: Taxotere (Doxetaxel) Eye Injury Prods Liab. Litig.*,
MDL No. 3203, 2022 WL 303562 (J.P.M.L. Feb. 1, 2022) ............................................ 14, 16

*In re Viagra (Sildenafil Citrate) Prods. Liab. Litig.*,
224 F.Supp.3d 1330 (J.P.M.L 2016) ......................................................................... 17

*In re Zostavax (Zoster Vaccine Live) Prods. Liab. Litig.*,

330 F. Supp. 3d 1378 (J.P.M.L. 2018)................................................................................... 14, 15

*Roundup Prods Liab. Litig.*,
   214 F. Supp. 1346 (J.P.M.L 2016)......................................................................................... 17

**Statutes**

28 U.S.C. § 1407........................................................................................................... 14, 15, 17

**Other Authorities**

A Look at the Judicial Panel on Multidistrict Litigation,
   72 F.R.D. 211 (1977) ............................................................................................................ 18

Manual For Complex Litigation (Fourth) § 20.131 (2004) ......................................................... 18

## INTRODUCTION

Pursuant to 28 U.S.C. § 1407 and Rule 6.2 of the Rules of Procedure of the Judicial Panel on Multidistrict Litigation, Movants[1] respectfully submit this Brief in support of their Motion for Transfer of Actions for Coordinated Pretrial Proceedings of all currently filed benzoyl peroxide ("BPO") class actions (hereinafter referred to as "Subject Actions"),[2] as well as any subsequently filed cases involving similar facts or claims arising from Defendants' false and misleading advertising of BPO Products without telling consumers the BPO Products degrade to benzene exposing them to harm.  There are now 30 actions alleging overlapping class claims related to benzene in BPOs, pending in 10 different judicial districts, before 24 different district judges.  And, while each case names various overlapping Defendants, underlying the lawsuits are the same core scientific and legal issues will need to be decided—namely, Article III standing, preemption, whether BPO products degrade into benzene and, if so, whether that fact caused an economic injury on the putative classes suitable for class treatment.  Indeed, Defendants have started filing nearly identical motions concerning these core issues, setting the stage for judicial disharmony should different courts be asked to rule on these core overlapping issues.  For these reasons, and as discussed below, the Subject Actions should be transferred and centralized for pretrial coordination.  Movants request centralization in the Northern District of California,

---

[1] Movants are Plaintiffs in the following cases:  *Howard v Alchemee, LLC,* 2:24-cv-01834-SB-BFM (C.D. Cal.)*; Montenegro v. CVS Pharmacy, Inc.,* 2:24-cv-01876-SB-BFM (C.D. Cal.)*; Montenegro v. Johnson & Johnson Consumer, Inc.,* 2:24-cv-01895-SB-BFM (C.D. Cal.)*; Montenegro v. RB Health (US) LLC* 2:24-cv-01878-SB-BFM (C.D. Cal.)*; Harris v. Genomma Lab USA, Inc.,* 1:24-cv-00289-JLT-SKO (E.D. Cal.)*; Navarro v. Walgreens Boots Alliance, Inc.,* 1:24-cv-00290-KES-SKO (E.D. Cal.)*; Navarro v. Target Corporation,* 1:24-cv-00280-JLT-SAB (E.D. Cal.)*; Navarro v. Walmart, Inc.,* 1:24-cv-00288-JLT-BAM (E.D. Cal.)*;Garcia v. Crown Laboratories, Inc.,* 3:24-cv-01448-EMC (N.D. Cal.)*; Ramos v. Alchemee, LLC,* 5:24-cv-02230-BLF (N.D. Cal.)*; and Snow v. L'Oreal USA, Inc.,* 1:24-cv-00110-MWJS-KJM (D. Haw.).

[2] *See*, Schedule of Subject Actions.

Central District of California, or the Eastern District of California, where the plurality of cases are pending and where the first cases were filed.

## BACKGROUND

### I.    BPO Degrades to Benzene Under Normal Use and Handling

The Subject Actions were filed following the release of testing data by Valisure, LLC[3] ("Valisure") showing that acne vulgaris ("acne") treatment drug products formulated with BPO ("BPO Products") are fundamentally unstable and degrade into illegal levels of benzene under normal and expected consumer use, handling, and storage conditions. It is undisputed within the scientific community that benzene is a potent human carcinogen, with no safe level of human exposure identified. The U.S. Food and Drug Administration ("FDA") recognizes benzene as carcinogen that can cause cancer in humans[4] and classifies it as a "Class 1" solvent that must be "avoided" in drug manufacturing.[5] The FDA allows one limited exception – where the use of benzene in a drug product is unavoidable to produce a drug product with a significant therapeutic advantage otherwise not available. In that instance, benzene must be restricted to two parts per million (ppm).[6] Defendants' BPO Products do not meet this rare exception—in other words, there should not be *any* benzene in BPO Products.

---

[3] Valisure is a third-party analytical laboratory that is accredited to International Organization for Standardization ("ISO/IEC") 17025:2017 standards for chemical testing (PJLA Accreditation Number 94238). Valisure developed and validated methods to test medications and consumer products distributed in the United States. Valisure has tested a variety of drug and consumer healthcare products for benzene including sunscreens, antiperspirants, body sprays, hand sanitizers, and dry shampoos for benzene.

[4] U.S. Food and Drug Administration, *"Questions and Answers on the Occurrence of Benzene in Soft Drinks and Other Beverages*," (Feb. 25, 2022), https://www.fda.gov/food/chemicals/questions-and-answers-occurrence-benzene-soft-drinks-and-other-beverages

[5] Food and Drug Administration, *Q3C – Tables and Lists Guidance for Industry,* https://www.fda.gov/media/71737/download (last visited September 26, 2023).

[6] *Id.*

BPO Products are acne treatment products intended to travel with the consumers for repeat application (often multiple times a day).  Creams, lotions, and ointments are applied directly to the face and other areas known for acne.  Benzene is volatile—meaning, within minutes, any benzene in a BPO Product will be released as vapor to be inhaled by the consumer. Benzene serves no therapeutic value—reducing exposure to benzene is always advised.

In 2023, Valisure tested 175 finished acne treatment products (with and without BPO) to determine whether any had benzene.  Of the 175 products tested, 99 were formulated with BPO and included popular BPO Products.[7]  Importantly, at baseline, before any heat or humidity was applied to these products, 94 of 99 (95%) of them contained benzene, some with levels that far exceed the 2-ppm limit imposed by FDA.

To understand the product's stability, Valisure used three incubation temperatures to evaluate the effects of common distributor and consumer use, handling, and storage conditions on benzene formation. 37°C/98.6°F was used for human body temperature, 50°C/122°F was used to evaluate shelf-life performance as an accelerated stability testing temperature used by the pharmaceutical industry,[8] and 70°C/158°F to model storage in a hot vehicle.[9]  Benzene concentrations were measured at certain time intervals using GC-MS, and benzene findings were

[7] Proactiv 2.5% BPO Cream, Target Up & Up 2.5% BPO Cream, Equate Beauty 10% BPO Cream, Equate BPO Cleanser, Neutrogena 10% BPO Cleanser, Clearasil 10% BPO Cream, CVS Health 10% BPO Face Wash, Walgreens 10% BPO Cream, La Roche Posay BPO Cream, and Clean & Clear 10% BPO Lotion.  Exh. 1, Valisure, LLC, *Valisure Citizen Petition on Benzene in Benzoyl Peroxide Acne Drugs,"* (March 4, 2024), https://www.valisure.com/valisure-newsroom/fda-citizen-petition-8-benzene-in-benzoyl-peroxide-products, pp 16-18.
[8] Ghimire, Prakash et al., *Guidelines on Stability Studies of Pharmaceutical Products and Shelf-Life Estimation.* INTERNATIONAL JOURNAL OF ADVANCES IN PHARMACY AND BIOTECHNOLOGY, (2020). 06. 15-23. 10.38111/ijapb.20200601004.
[9] Grundstein A, Meentemeyer V, Dowd J. *Maximum vehicle cabin temperatures under different meteorological conditions.* Int J Biometeorol. 2009 May;53(3):255-61. doi: 10.1007/s00484-009-0211-x. Epub 2009 Feb 21. PMID: 19234721.

3

plotted in real time and reported in ppm.[10]

  Valisure's results confirm that on-market BPO Products degrade into benzene and can form levels up to 800 times the conditionally restricted FDA concentration limit of 2 ppm for benzene when handled, used, or stored at expected an/or accelerated temperatures.[11] Unexpectedly, the Valisure scientists found that benzene was also released into the surrounding air even when the BPO Products' packaging was *closed* raising concern for even more inhalation exposures—a particularly pernicious form of exposure to benzene.[12]  Consumers storing their BPO Products in a warn and humid environment, i.e., a small bathroom or car glove box, could see levels of benzene rise in the air similar to those seen in occupational settings, were benzene inhalation is closely monitored and controlled.  In contrast, the levels of benzene found in the 76 non-BPO products were null to *de minimus*.[13]

  To be sure, subjecting BPO Products to stressful conditions does not always simulate the situations in which consumers might be exposed to benzene from BPO Products.  It, however, underscores the fundamental instability of BPO Products and their affinity for forming into benzene.  Moreover, the data also shows that BPO Products have benzene *before* any stress conditions, i.e., at baseline.  Indeed, on information and belief, Movants allege that these Defendants' products, while also generating benzene in the home or car, are also unsafe at the point of purchase because they contain benzene from the outset.

---

  [10] Valisure's findings were reported to the FDA in its March 4, 2024 Citizen's Petition.  *See* Valisure, LLC, *"Valisure Citizen Petition on Benzene in Benzoyl Peroxide Acne Drugs,"* (March 4, 2024), https://www.valisure.com/valisure-newsroom/fda-citizen-petition-8-benzene-in-benzoyl-peroxide-products, pp 16-18.
  [11] *Id.*
  [12] *Id.* at 19.
  [13] *Id.* at 15 ("76 non-BPO products had no detectable benzene or values below 0.1ppm. 6 non-BPO products contained traces of benzene below 2 ppm, which could be due to various inactive ingredients used in consumer products that have been theorized to contain trace benzene").

Valisure's testing of BPO Products has been peer-reviewed and published in the prestigious epidemiological journal, Environmental Health Perspectives.[14]  To date, the FDA has not responded or ruled on the pending citizen's petition from Valisure.  It does not appear that any Defendant has voluntarily recalled any products, despite the citizen's petition and the peer-reviewed literature.

These Defendants knew or should have known that BPO Products exposed users to benzene.  The Defendants, however, never listed benzene among the ingredients, or anywhere on the labels, containers, advertising or on their websites. The manufacturers and sellers never told consumers their BPO Products had benzene or were at risk of benzene contamination from normal and expected use and handling.  By not disclosing this material fact, consumers purchased BPO Products that they never would have and/or products that were illegal for sale in the United States due to levels of benzene rendering the products unfit for human use.  Class members, under various state consumer protection laws, are entitled to full and/or partial refunds on their purchases of BPO Products.

The contamination of consumer products, drugs, and foods with carcinogens and neurotoxins has topped headlines in recent years because of testing by concerned citizens and laboratories including Valisure.  In 2020, the FDA began working with manufacturers and sellers to identify benzene contamination in consumer products and drugs, which resulted in product recalls of hand sanitizers, sunscreens, and deodorants, including Johnson and Johnson Consumer Products, Inc.'s Aveeno and Neutrogena sunscreen lines.[15]  In December 2022, the FDA issued a warning to manufacturers (updated on December 27, 2023) reiterating their statutory obligation

---

[14] Kucera K, et al., *Benzoyl Peroxide Drug Products Form Benzene*, 3 ENV. HEALTH PERSPECT. 132, 37702-1–3 (Mar. 2024).
[15] Johnson & Johnson Consumer Inc., *Voluntarily Recall of Specific Neutrogena and Aveeno Aerosol Sunscreen Products Due to the Presence of Benzene*," (July 14, 2021).

to test their products before selling them to the public:

> FDA reminds manufacturers they are required to establish scientifically sound and appropriate specifications and test procedures to assure drug components (active and inactive ingredients) and finished drug products conform to appropriate quality specifications (21 C.F.R. 211.84, 21 C.F.R. 211.160). This includes testing of raw materials and finished batches (21 C.F.R. 211.165) prior to release to ensure they meet appropriate specifications for identity, strength, quality, and purity.[16]

The FDA warned that any drug products or components at risk of benzene contamination should be tested, and any batches with benzene above 2 ppm should not be released to the public.[17] Further, if any drug or drug component was subject to deterioration or degradation, drug manufacturers must have re-testing procedures in place to ensure continued purity and stability.[18] Finally, if any drug products in circulation were found to have benzene over 2 ppm, the manufacturer must contact the FDA to discuss a voluntarily recall.[19]  Selling BPO Products contaminated with benzene renders the drugs misbranded and adulterated, and not legally available for sale in the United States.

## II.    BPO Litigation Procedural History

Following the March 4, 2024 release of the Valisure benzene BPO data, the Subject Actions were filed nationwide naming BPO Product manufacturers and sellers including: Defendants Alchemee LLC, Taro Pharmaceutical U.S.A., Inc., Taro Pharmaceuticals Industries, Ltd., CVS Pharmacy, Inc., CVS Health Corporation, RB Health (US) LLC, Johnson & Johnson Consumer, Inc., Walmart, Inc., Wal-Mart Stores, Inc., Genomma Lab USA, Inc., Walgreens Boots Alliance, Inc., L'Oreal USA, Inc., L'Oreal, USA Crown Laboratories, Inc., Target Corporation, Padagis Israel Pharmaceuticals Limited, Padagis US LLC, Padagis LLC, and

---

[16] U.S. Food and Drug Administration, "*FDA Alerts Drug Manufacturers to the Risk of Benzene in Certain Drugs*," (Dec. 22, 2022), 1.
[17] *Id.*, 3.
[18] *Id.*, 2.
[19] *Id.*

Perrigo Company PLC.  Importantly, because most consumers purchased BPO products from multiple manufacturers, some Plaintiffs are class representatives in multiple putative classes against various Defendants. Thus, there are identical plaintiffs in multiple lawsuits and identical defendants in different jurisdictions.

The Movants are 17 plaintiffs ("Plaintiffs") in 11 actions pending in 4 different federal jurisdictions who bought the first BPO Product class actions in the country.  Each Plaintiff purchased BPO Products to treat their acne believing the products were safe and not contaminated with benzene, or at risk of benzene contamination when used and handled as expected.

Since filing of the complaints, each Defendant has reached out and obtained numerous extensions to respond.  As such, to date, no discovery has occurred.  Nor have any substantive motions been ruled upon at this time.

In the Northern District of California,[20] there are four pending cases before the Honorable Edward M. Chen, Beth L. Freeman, and Charles R. Breyer.  There is currently an "Order to Show Cause" why two cases (*Garcia* and *Teron*) alleging similar claims against Alchemee, LLC should be consolidated before Judge Freeman.  One the cases is represented by undersigned counsel and the other is represented, in a competing putative class counsel.  Plaintiffs have purposed delaying resolution of this OSC until such time as this panel rules on this petition (wherein, presumably, master class action complaints would be filed against each Defendant subject to a coordinated protocol).  In the Northern District of California, no motions to dismiss have been filed, although a responsive pleading is due in *Garcia* on June 14, 2024 and *Ramos* on

---

[20] Movants are in *Garcia v. Crown Laboratories*, Case No. 3:24-cv-01448-EMC (N.D. Cal.) and *Ramos v. Alchemee, LLC*, Case No.  5:24-cv-02230-BLF (N.D. Cal.).  Two additional cases, *Daugherty v. Padagis Israel Pharmaceuticals Limited*, 3:24-cv-02066-CRB (N.D. Cal.) and *Teron v. Alchemee, LLC*, 5:24-cv-01918-BLF (N.D. Cal.) are represented by different counsel.

June 3, 2024.

In the Central District of California,[21] there are five pending BPO cases before, four before the Honorable Stabley Blumenfeld, Jr. and one before the Honorable James V. Selna.  For the four related cases before Judge Blumenfeld, an initial status conference was scheduled for May 24, 2024, however, the court continued those conferences and asked the Parties to inform the Court about pending efforts transfer under Sections 1407 and 1404.  Motions to dismiss have been filed in each case, with each motion repeating nearly identical arguments.  Those motions are set to be heard on June 28, 2024.  Additionally, in *Howard (*2:24-cv-01834-SB-BFM), Defendants Alchemee LLC and Taro Pharmaceuticals U.S.A., Inc. have filed a motion to transfer under Section 1404 to the Southern District of New York, even though the first-filed case was in the Central District of California.  In *Montenegro* (2:24-cv-01895-SB-BFM), Defendant Johnson & Johnson Consumer, Inc. has filed a motion to transfer the case under Section 1404 to the District of New Jersey, even though the first-filed case was in the Central District of California and there is no pending cases in New Jersey.  Should Alchemee LLC, Taro Pharmaceuticals U.S.A., and Johnson & Johnson's motions be granted, overlapping Plaintiffs, in California, will be forced to litigate their case in different forums across the country and this litigation will encumber even more courts with BPO litigation.  Defendants' efforts at forum shopping has yet to be ruled on, and the court is set to hear the motions on June 28, 2024.  In Del Toro (8:24-cv-00573-JVS-JDE), the court has extended the time to make responsive pleadings until June 14, 2024.

---

[21] Movants are in *Howard v. Alchemee, LLC*, 2:24-cv-01834-SB-BFM (C.D. Cal.); *Montenegro v. CVS Pharmacy, Inc.*, 2:24-cv-01876-SB-BFM (C.D. Cal.);  *Montenegro v. Johnson & Johnson Consumer, Inc.*, 2:24-cv-01895-SB-BFM (C.D. Cal.); and *Montenegro v. RB Health (US) LLC*, 2:24-cv-01878-SB-BFM (C.D. Cal.). Another case, *Del Toro v. Crown Laboratories, Inc.*, 8:24-cv-00573-JVS-JDE (C.D. Cal.) is represented by other counsel.

In the Eastern District of California,[22] there are four BPO cases pending before two judges.  *Harris* (1:24-cv-00289-JLT-SKO) is before the Honorable Jennifer L. Thurston.  An initial status conference is scheduled for June 11, 2024 and Defendant Genomma Lab USA, Inc.'s answer deadline is May 24, 2024.  *Navarro* (1:24-cv-00290-KES-SKO) is also before Judge Thurston, with an initial status conference scheduled for September 12, 2024.  Walmart, Inc's answer deadline is June 10, 2024.  *Navarro* (1:24-cv-00280-JLT-SAB) is also before Judge Thurston, with an initial status conference scheduled for September 17, 2024. Target Corporation's answer deadline is May 30, 2024.  *Navarro* (:24-cv-00290-KES-SKO) is before the Honorable Kirk E. Sherriff.  It has an initial status conference scheduled for August 29, 2024. Defendant Walgreens Boots Alliance, Inc.'s answer deadline is May 30, 2024.

In the District of Hawaii, the case *Snow v. L'Oreal USA, Inc.*, 1:24-cv-00110-MWJS-KJM (D. Haw.) is before the Honorable Micah W.J. Smith.  An initial scheduling conference is scheduled for June 26, 2024.  L'Oreal USA, Inc.'s answer deadline is May 30, 2024.  Defendant L'Oreal intends to seek transfer of the case to the Southern District of New York, although the motion has not yet been filed and the first-filed case was in Hawaii.

As shown on the Schedule of Actions, there are several other BPO class actions pending in other jurisdictions, including the Northern District of Illinois (six actions), Western District of Missouri (4 actions), Southern District of New York (two actions), District of South Carolina (one action), Eastern District of Louisiana (one action), and District of Minnesota (one action). As Movants are no involved directly with any of those actions, Movants cannot comment on their procedural postures beyond noting that they allege overlapping classes and causes of

---

[22] Movants are in *Harris v. Genomma Lab USA, Inc.*, 1:24-cv-00289-JLT-SKO (E.D. Cal.); *Navarro v. Walgreens Boots Alliance, Inc.*, 1:24-cv-00290-KES-SKO (E.D. Cal.); *Navarro v. Walmart, Inc.*, 1:24-cv-00288-JLT-BAM (E.D. Cal.); and *Navarro v. Target Corporation*, 1:24-cv-00280-JLT-SAB (E.D. Cal.).

actions as those case filed first by Movants.

## III.     Attempts at Informal Coordination

On April 22, 2024, Movants sent a letter to Defendants requesting a group meet and confer to discuss the potential for coordination using Section 1404 transfers and/or the possibility of an MDL under Section 1407.  Exh. 2.  Movants never received any formal or direct response beyond coordination being discussed, in passing, with a handful of Defendants during court-ordered initial meet and confers.  It appears (although Movants shall see in response to this petition) most Defendants do not agree on any coordination that would lead to a single court presiding over these nearly identical claims, with nearly identical scientific and legal issues.

## <u>ARGUMENT</u>

## I.     Centralization is Warranted for These Cases

Under 28 U.S.C. § 1407, the Panel may consolidate multiple cases if the moving parties sufficiently demonstrate that: 1) the lawsuits involve one or more common questions of fact; 2) consolidation will best serve the convenience of the parties and witnesses; and 3) consolidation will promote the just and efficient conduct of such lawsuits.  28 U.S.C. § 1407(a).  As shown herein, the BPO cases meet the requirements for centralization, and on this record, centralization in one district court for pre-trial proceedings is the most appropriate course of action for the Panel to take.  *See, e.g.*, *In re: Taxotere (Doxetaxel) Eye Injury Prods Liab. Litig.*, MDL No. 3203, 2022 WL 303562, at *1-*3 (J.P.M.L. Feb. 1, 2022) (recently granting centralization of thirteen lawsuits filed against Sanofi-Aventis U.S. LLC and Sanofi US Services Inc. arising out of eye injuries suffered by Taxotere users); *see also In re Zostavax (Zoster Vaccine Live) Prods. Liab. Litig.*, 330 F. Supp. 3d 1378, 1379 (J.P.M.L. 2018) (granting defendant's motion for centralization in cases wherein plaintiffs alleged they had suffered various types of injuries, including encephalitis, optical nerve damage, kidney and liver damage, Bell's palsy, Guillain

10

Barre Syndrome, and other injuries as due to Merck's shingles vaccine).

First, each BPO lawsuit alleges the same facts against the same constellation of Defendants. Each lawsuit has identical allegations about BPO and the formation of benzene under normal use and handling conditions. Each lawsuit seeks economic damages associated with the contamination of BPO products with benzene. This means multiple and complicated legal and factual issues will drive each of these cases, including:

- Whether BPO products degrade into benzene, and if so, why;

- The admissibility of experts under *Daubert* concerning the mechanism of the formation of benzene from BPO products and, if relevant, any health risks imposed by such exposure;

- Whether a plaintiff purchasing benzene contaminated BPO products sustained an injury under Article III of the United States Constitution;

- Whether being exposed to benzene from a BPO product is material to the consumer;

- Whether federal law preempts state consumer protection claims related to BPO products;

- Whether Valisure's citizen's petition and peer-reviewed publication are reliable evidence of BPO products form into benzene;

- Whether selling benzene contaminated BPO products violated the state consumer protection laws outlined in the various complaints;

- Whether certification of classes of consumers who purchased benzene contaminated BPO products is appropriate under Fed. R. Civ. P. 23, whether for injunctive or economic relief, pursuant to consumer protection laws of each state;

11

and

- Determination and structure of class counsel.

These are all common legal and factual issues that should be decided by a single court.  To be sure, discovery on each Defendant will be specific to each Defendant—just as it is it will be specific to each putative class representative across different cases.  But, even on this point, centralized coordination is key.  Determining the scope of class discovery, ESI, product preservation, testing, etc., is common to all the Defendants.  Having a single court adjudicate that process, with coordinated counsel on both sides, will dramatically reduce the burden on the judiciary and the Parties.

Second, coordination before one MDL court will prevent inconsistent rulings, would eliminate duplicative discovery, will be more convenient to the parties, witnesses, and their counsel, and will conserve the resources of the judiciary, the parties, and their counsel.  *See In re Zostavax*, 330 F. Supp. 3d at 1379 (highlighting that consolidation will eliminate duplicative discovery, prevent inconsistent pretrial rulings on *Daubert* issues and other pretrial matters, and conserve resources); *In re MLR, LLC, Patent Litig.*, 269 F. Supp. 2d 1380, 1381 (J.P.M.L. 2003) (same).

There are multiple and threshold legal disputes—some already pending in various cases—related to preemption, Article III standing, causation, and pleading.  With different courts adjudicating these identical issues under different Circuit caselaw, a lack of centralization will invariably cause judicial disharmony—all of which centralization under Section 1407 would avoid.  Indeed, this point is underscored by certain Defendants actively seeking to have their cases transferred to different jurisdictions and judges under Section 1404, which would only further increase the risk of judicial disagreement.  Uniform application of the law on these important and hot-topic defenses furthers the goal and purpose of Section 1407.

Even after initial legal issues, there are complex and common issues of science; where different courts can reach different conclusions.  This becomes particularly concerning for *Daubert* and summary judgment motions, given the complex scientific and legal concepts at issue, industry's historical knowledge of BPO degradation over many decades, and Defendants' claims of federal preemption in these actions.  Having one court rule on these cross-cutting scientific and legal issues is important—especially when Defendants intend to rigorously dispute whether benzene is present in their BPO products and, if so, whether the levels are relevant.

And, this concern for conflicting rulings is not speculative.  These cases are guided by different scheduling orders and motions are filed and ruled upon at different times, which means that unsuccessful matters in one jurisdiction can be re-framed and re-litigated in other jurisdictions.  This incentivizes forum shopping and places a strain on the judiciary.  Informal coordination cannot practically eliminate these risks with so many cases and districts.

The same applies to anticipated discovery.  A transferee judge can "employ any number of techniques … to manage pretrial proceedings efficiently."  *In re Proton Pump Inhibitor Prods. Liab. Litig. (No. II)*, 261 F. Supp. 3d 1351, 1354 (J.P.M.L. 2017).  Consequently, "formal centralization under section 1407 is the best course." *Id.*  Indeed, because the lawsuits all point to Defendants' false and misleading advertising and sale of BPO Products and nationwide misrepresentations and omissions of health and safety information, the parties will address the same issues in discovery common to all litigants, including the Defendants' marketing practices, historical knowledge of BPO degradation, stability and impurity testing during manufacturing, sale, and post-sale, and any industry collusion to conceal evidence from consumers.  *See In re Bair Hugger Forced Air Warming Devices Prods. Liab. Litig.*, 148 F. Supp. 3d 1383, 1385 (J.P.M.L. 2015) (deeming transfer appropriate where related actions shared factual issues related to allegations of injuries from a defective warming system); *see also In re Actos Prods. Liab.*

13

*Litig.*, 840 F. Supp. 2d 1356 (J.P.M.L. 2011) (same).

Finally, the need for centralization is warranted because there are already 30 BPO class action lawsuits on file in 10 different federal district courts across the country. Taken together, these cases will ultimately result in separate scheduling orders and duplicative discovery and pretrial practices if an MDL is not created, costing the judiciary and litigants time and resources. The panel should therefore order the formation of an MDL so that pretrial proceedings "will be conducted in a manner leading to the just and expeditious resolution of all actions to the overall benefit of the parties." *In re: Prempro Prods. Liab. Litig.*, 254 F. Supp. 2d 1366, 1368 (J.P.M.L. 2003); *see also In re: Taxotere (Doxetaxel) Eye Injury Prods Liab. Litig.*, MDL No. 3203, 2022 WL 303562, at *1 (granting centralization for 13 lawsuits); *In re: Farxiga*, 273 F. Supp. 3d at 1381-82 (granting centralization for 18 lawsuits).

## II.      Informal Coordination is Impractical

Informal coordination is not a practical alternative to centralization for these cases. "[T]he number of actions, districts, and involved counsel, and the complexity of the litigation, make effective coordination on an informal basis impracticable." *In re Uber Tech., Inc.*, *Data Breach Litig.*, 304 F.Supp.1351, 1354 (J.P.M.L. 2018) (informal coordination was not a practicable alternative to centralization where ten actions, with a potential for seven more, were pending in nine districts). It would be inefficient and uneconomical to engage in informal coordination amongst so many different cases, districts, and involved counsel, and as previously discussed, attempts at informal coordination of the first filed cases proved to be futile and impractical. *See In re: Roundup Prods Liab. Litig.*, 214 F. Supp. 1346, 1348 (J.P.M.L 2016) (concluding informal coordination of 37 actions pending in 21 districts was not practicable).

"The number of involved districts … pose[s] [a] significant obstacle[] to informal coordination" especially for discovery. *In re Viagra (Sildenafil Citrate) Prods. Liab. Litig.*, 224

14

F.Supp.3d 1330, 1331 (J.P.M.L 2016).  As is common in an MDL proceeding, Plaintiffs

anticipate taking the depositions of Fed. R. Civ. P. 30(b)(6) corporate witnesses, Defendants'

researchers and scientists, drug formulators, regulatory and compliance officers, third-party

witnesses, and other current and former employees of Defendants, many of whom will be

deposed in multiple cases or will discuss overlapping issues.  It would be exceedingly difficult to

informally coordinate the timing and scope of this discovery across many cases in various stages

of litigation.  This is particularly true considering that much of the BPO used by these

Defendants comes from the same third-party manufacturers; coordination of that discovery

across competing class cases is not only difficult, but likely impossible.  "[A] single court can

more effectively manage the discovery disputes … likely to arise, including those relating to

discovery from third party witnesses, depositions of apex witnesses, and the scope of relevant

discovery, generally."  *In re Ahern Rentals, Inc., Trade Secret Litig.*, 481 F.Supp.3d 1355, 1356

(J.P.M.L. 2020) (granting consolidation in lieu of informal coordination for ten actions pending

in eight districts).  Centralization of these proceedings, rather than informal coordination, would

thus be more convenient for the parties and witnesses and would "promote the just and efficient

conduct of such actions."  28 U.S.C. § 1407(a).

## III.    There Are Several Appropriate Venues for These Cases

The selection of a transferee court is based on a balancing test of several factors, none of

which is dispositive.  *See* Manual For Complex Litigation (Fourth) § 20.131 (2004) (citing

Robert A. Cahn, A Look at the Judicial Panel on Multidistrict Litigation, 72 F.R.D. 211, 214-15

(1977)).  These factors include "where the largest number of cases is pending, where discovery

has occurred, where cases have progressed furthest, the site of the occurrence of the common

facts, where the cost and inconvenience will be minimized, and the experience, skill, and

caseloads of available judges."  *Id.*  Due to the infancy of this litigation in federal court, many of

these factors are not applicable.  The Subject Actions were filed in March and April of this year, and no Defendant have answered any of the Complaints.  The list of Defendants is already fairly numerous, and they are located throughout the United States, on both sides of the country.  *See, e.g.*, *In re ClassicStar Mare Lease Litig.,* 528 F. Supp. 2d 1345, 1347 (J.P.M.L. 2007) ("Given the many parties and interests involved, there is no perfect choice for the transferee court.").  Against this background, Plaintiffs propose any of the following courts as appropriate venues for this MDL: Northern District of California, Central District of California, and Eastern District of California.   These venues have plurality of pending cases, which were all filed first, and possess easily accessible courts to accommodate an MDL.  Indeed, several Defendants have asked to have out-of-state cases transferred to California district courts (and two are trying to leave to New York and New Jersey).  These proposed courts have experienced jurists and can accommodate a class action MDL like this one; with the Northern and Central Districts having the most MDL experience.  Class certification caselaw, especially regarding consumer protection claims, is well developed in the Ninth Circuit, which should help the Parties reach rulings that, win or lose, will avoid protracted appellate litigation and, possibly, lead to quicker resolution. Overall, considering the national nature of the litigation and large number cases pending in California federal courts, it would appear to be the obvious choice for this MDL.  Movants are not requesting a specific judge, as this case has not proceeded in any venue to a point where one judge, over another, would be better suited to preside over the MDL.

## <u>CONCLUSION</u>

Movants respectfully request that the Court **GRANT** this Motion to Transfer and centralize the instant actions in any of the proposed courts identified above.

Dated:  May 22, 2024

Respectfully submitted,

*/s/ Brent Wisner*
R. Brent Wisner (SBN: 276023)
rbwisner@wisnerbaum.com
Stephanie Sherman (SBN: 338390)
ssherman@wisnerbaum.com
**WISNER BAUM, LLP**
11111 Santa Monica Blvd., Suite 1750
Los Angeles, CA  90025
Telephone:  (310) 207-3233
Facsimile:  (310) 820-7444

*Counsel for Plaintiffs Diane Howard,*
*Chatham Mullins, William Eisman,*
*Christian M. Rainey, Tracey Cuomo, Alan*
*Montenegro, Melissa Medina, James*
*Mayfield, Michael Montgomery, Chinyere*
*Harris, Grace Navarro, Priscilla Garcia,*
*Noemi Gerena, Efren Ramos, Joshua Cross,*
*Marisol Scharon, and Jennifer Snow*