ADRMOP

# U.S. District Court
# California Northern District (San Francisco)
# CIVIL DOCKET FOR CASE #: 3:24-cv-02066-CRB

Daugherty et al v. Padagis Israel Pharmaceuticals Limited et al
Assigned to: Judge Charles R. Breyer
Cause: 28:1332 Diversity-Other Contract

Date Filed: 04/04/2024
Jury Demand: Plaintiff
Nature of Suit: 195 Contract Product
Liability
Jurisdiction: Diversity

### Plaintiff

**Lindsey Daugherty**                    represented by **R. Jason Richards**
Aylstock, Witkin, Kreis and Overholtz,
PLLC
17 E. Main Street
Suite 200
Pensacola, FL 32502
850-202-1010
Fax: 850-916-7449
Email: JRichards@awkolaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Sin-Ting Mary Liu**
Aylstock Witkin Kreis & Overholtz, PLLC
17 East Main Street, Suite 200
Pensacola, FL 32502
(850) 202-1010
Fax: (760) 304-8933
Email: mliu@awkolaw.com
*ATTORNEY TO BE NOTICED*

### Plaintiff

**Tuan Nguyen**                          represented by **R. Jason Richards**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Sin-Ting Mary Liu**
(See above for address)
*ATTORNEY TO BE NOTICED*

### Plaintiff

**Cole Scroggs**                         represented by **R. Jason Richards**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Sin-Ting Mary Liu**

(See above for address)
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Padagis Israel Pharmaceuticals Limited**

**Defendant**

**Padagis US LLC**

**Defendant**

**Padagis LLC**

**Defendant**

**Perrigo Company plc**

| Date Filed | # | Docket Text |
|---|---|---|
| 04/04/2024 | 1 | COMPLAINT *Class Action Complaint* against Padagis Israel Pharmaceuticals Limited, Padagis LLC, Padagis US LLC, Perrigo Company plc ( Filing fee $ 405, receipt number ACANDC-19292046.). Filed by Lindsey Daugherty, Cole Scroggs, Tuan Nguyen. (Attachments: # 1 Civil Cover Sheet)(Liu, Sin-Ting) (Filed on 4/4/2024) (Entered: 04/04/2024) |
| 04/04/2024 | 2 | Proposed Summons. (Liu, Sin-Ting) (Filed on 4/4/2024) (Entered: 04/04/2024) |
| 04/04/2024 | | Electronic filing error. Civil Cover Sheet. Please choose a Divisional Assignment and re-file the Civil Cover Sheet in its entirety. This filing will not be processed by the clerks office. Re: 1 Complaint, filed by Lindsey Daugherty, Tuan Nguyen, Cole Scroggs (kmg, COURT STAFF) (Filed on 4/4/2024) (Entered: 04/04/2024) |
| 04/04/2024 | 3 | Civil Cover Sheet by Lindsey Daugherty, Tuan Nguyen, Cole Scroggs . (Liu, Sin-Ting) (Filed on 4/4/2024) (Entered: 04/04/2024) |
| 04/05/2024 | 4 | Case assigned to Magistrate Judge Peter H Kang. Counsel for plaintiff or the removing party is responsible for serving the Complaint or Notice of Removal, Summons and the assigned judge's standing orders and all other new case documents upon the opposing parties. For information, visit *E-Filing A New Civil Case* at http://cand.uscourts.gov/ecf/caseopening. Standing orders can be downloaded from the court's web page at www.cand.uscourts.gov/judges. Upon receipt, the summons will be issued and returned electronically. A scheduling order will be sent by Notice of Electronic Filing (NEF) within two business days. Consent/Declination due by 4/19/2024. (kmg, COURT STAFF) (Filed on 4/5/2024) (Entered: 04/05/2024) |
| 04/05/2024 | 5 | **Initial Case Management Scheduling Order with ADR Deadlines: Case Management Statement due by 7/4/2024. Initial Case Management Conference set for 7/11/2024 10:30 AM in San Francisco, Courtroom F, 15th Floor. (far, COURT STAFF) (Filed on 4/5/2024) (Entered: 04/05/2024)** |
| 04/05/2024 | | Electronic filing error. ONLY ONE SUMMONS TO BE ISSUED PER CASE, USE AN ATTACHMENT TO SUMMONS IF NEEDED TO LIST ADDITIONAL DEFENDANTS |

CAND-ECF

| | | INFORMATION [err201].This filing will not be processed by the clerks office.Please re-file in its entirety. Re: 2 Proposed Summons filed by Lindsey Daugherty, Tuan Nguyen, Cole Scroggs (far, COURT STAFF) (Filed on 4/5/2024) (Entered: 04/05/2024) |
|---|---|---|
| 04/08/2024 | 6 | Proposed Summons. (Liu, Sin-Ting) (Filed on 4/8/2024) (Entered: 04/08/2024) |
| 04/08/2024 | 7 | Summons Issued as to Padagis Israel Pharmaceuticals Limited, Padagis LLC, Padagis US LLC, Perrigo Company plc. (far, COURT STAFF) (Filed on 4/8/2024) (Entered: 04/08/2024) |
| 04/11/2024 | 8 | CONSENT/DECLINATION to Proceed Before a US Magistrate Judge by Lindsey Daugherty, Tuan Nguyen, Cole Scroggs.. (Liu, Sin-Ting) (Filed on 4/11/2024) (Entered: 04/11/2024) |
| 04/11/2024 | 9 | CLERK'S NOTICE OF IMPENDING REASSIGNMENT TO A U.S. DISTRICT COURT JUDGE: The Clerk of this Court will now randomly reassign this case to a District Judge because either (1) a party has not consented to the jurisdiction of a Magistrate Judge, or (2) time is of the essence in deciding a pending judicial action for which the necessary consents to Magistrate Judge jurisdiction have not been secured. You will be informed by separate notice of the district judge to whom this case is reassigned.<br><br>ALL HEARING DATES PRESENTLY SCHEDULED BEFORE THE CURRENT MAGISTRATE JUDGE ARE VACATED AND SHOULD BE RE-NOTICED FOR HEARING BEFORE THE JUDGE TO WHOM THIS CASE IS REASSIGNED.<br><br>*This is a text only docket entry; there is no document associated with this notice.* (jaf, COURT STAFF) (Filed on 4/11/2024) (Entered: 04/11/2024) |
| 04/11/2024 | 10 | **ORDER REASSIGNING CASE. Case reassigned using a proportionate, random, and blind system pursuant to General Order No. 44 to Judge Charles R. Breyer for all further proceedings. Magistrate Judge Peter H Kang no longer assigned to case, Notice: The assigned judge participates in the Cameras in the Courtroom Pilot Project. See General Order No. 65 and http://cand.uscourts.gov/cameras.. Signed by Clerk on 4/11/2024. (Attachments: # 1 Notice of Eligibility for Video Recording)(ark, COURT STAFF) (Filed on 4/11/2024) (Entered: 04/11/2024)** |
| 05/14/2024 | 11 | MOTION for leave to appear in Pro Hac Vice *for R. Jason Richards* ( Filing fee $ 328, receipt number ACANDC-19411774.) filed by Lindsey Daugherty, Tuan Nguyen, Cole Scroggs. (Attachments: # 1 Certificate of Good Standing)(Richards, R.) (Filed on 5/14/2024) (Entered: 05/14/2024) |
| 05/14/2024 | 12 | **ORDER by Judge Charles R. Breyer: Granting 11 Motion for Pro Hac Vice, R. Jason Richards. (ls, COURT STAFF) (Filed on 5/14/2024) (Entered: 05/14/2024)** |

| PACER Service Center | | |
|---|---|---|
| Transaction Receipt | | |
| 05/21/2024 20:08:32 | | |
| **PACER Login:** | sbsherman1 | **Client Code:** | BPO_General |
| **Description:** | Docket Report | **Search Criteria:** | 3:24-cv-02066-CRB |
| **Billable Pages:** | 3 | **Cost:** | 0.30 |

1  AYLSTOCK, WITKIN,
   KREIS & OVERHOLTZ, PLLC
2  MARY LIU (282884)
   17 East Main Street, Suite 200
3  Pensacola, FL 32502
   Telephone: 850-202-1010
4  Facsimile: 850-916-7449
   E-mail: mliu@awkolaw.com
5          cduer@awkolaw.com

6  *Attorneys for Plaintiff and others similarly situated*

7

8

9

10               **UNITED STATES DISTRICT COURT**
                 **NORTHERN DISTRICT OF CALIFORNIA**
11

12 **LINDSEY DAUGHERTY, TUAN**          **CASE NO.**   3:24-cv-2066
   **NGUYEN, and COLE SCROGGS,**
   **individually, and on behalf of all others**   **CLASS ACTION COMPLAINT FOR:**
13 **similarly situated,**

14                                        1. **UNFAIR COMPETITION IN**
                                             **VIOLATION OF BUSINESS AND**
15                                           **PROFESSIONS CODE §17200,** *et*
                    **Plaintiffs,**          *seq.*
16  **v.**                                 2. **FALSE AND MISLEADING**
                                             **ADVERTISING IN VIOLATION OF**
17                                           **BUSINESS AND PROFESSIONS**
                                             **CODE §17500,** *et seq.*
18 **PADAGIS ISRAEL PHARMACEUTICALS**    3. **VIOLATION OF MISSOURI**
   **LIMITED; PADAGIS US LLC; PADAGIS,**    **MERCHANDISING PRACTICES**
19 **LLC; and PERRIGO COMPANY PLC,**        **ACT § 407.010,** *et seq.*
                                          4. **FRAUD/MISREPRESENTATION**
20                  **Defendants.**       5. **NEGLIGENT**
                                             **MISREPRESENTATION**
21                                        6. **UNJUST ENRICHMENT/QUASI**
                                             **CONTRACT**
22

23

24                                        **DEMAND FOR JURY TRIAL**

25

26                      <u>**CLASS ACTION COMPLAINT**</u>

27        Lindsey Daugherty, Tuan Nguyen, and Cole Scroggs ("Plaintiffs"), individually, and on

28

behalf of all others similarly situated, by and through their attorneys, bring this class action complaint against Defendants Padagis Israel Pharmaceuticals Limited ("Padagis Ltd."), Padagis US LLC ("Padagis US"), Padagis, LLC ("Pedagis LLC"), and Perrigo Company PLC ("Perrigo") (collectively "Defendants"). Plaintiffs allege the following based upon personal knowledge as well as investigation by counsel, and as to all other matters, upon information and belief. Plaintiffs further believe that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

**NATURE OF THE ACTION**

1.      This is a class action lawsuit regarding Defendant's manufacturing, distribution, advertising, marketing, and sale of Perrigo® branded benzoyl peroxide products[1] (the "BPO Products") that contain dangerously high levels of benzene, a carcinogen that has been linked to leukemia and other blood cancers.

2.      Throughout this Complaint, references to federal law and Food and Drug Administration ("FDA") regulations are merely to provide context and are not intended to raise a federal question of law. All claims alleged herein arise out of violations of Missouri and California law, which in no way conflict, interfere with, or impose obligations that are materially different than those imposed by federal law.

3.      Prior to placing the BPO Products into the stream of commerce and into the hands of consumers to use on their skin, Defendants knew or should have known that the BPO Products contained benzene, but misrepresented, omitted, and concealed this fact to consumers, including Plaintiffs and Class members, by not including benzene on the BPO Products' labels or otherwise warning consumers about its presence.

4.      Plaintiffs and Class members reasonably relied on Defendants' representations that the BPO Products were safe, unadulterated, and free of any carcinogens that are not listed on

---

[1] The BPO Products refer to Perrigo® Benzoyl Peroxide Acne Treatment Gel 10% BPO, Perrigo® Benzoyl Peroxide Acne Treatment Gel 5% BPO, Perrigo® Benzoyl Peroxide Acne Treatment Gel 2.5% BPO, Perrigo® Benzoyl Peroxide Acne Medication Wash 10% BPO, and Perrigo® Benzoyl Peroxide Acne Medication Wash 5% BPO.

the label.

5.     Plaintiffs and Class members purchased the BPO Products, which contain harmful levels of benzene.

6.     The BPO Products are worthless because they contain benzene at levels which render the BPO Products adulterated, misbranded, and illegal to sell under federal law and California and Missouri state law.

7.     Defendants are therefore liable to Plaintiffs and Class members for misrepresenting and/or failing to disclose or warn that the BPO Products contain benzene or that the Products degrade into benzene.

**PARTIES**

8.     Plaintiff Lindsey Daugherty is a resident and citizen of Ukiah, California, located in Mendocino, California.  Within the applicable class period, including within the past three years, Plaintiff purchased Defendant's Perrigo® brand Benzoyl Peroxide Acne Treatment Gel 2.5% BPO from Riteaid in Mendocino County. When purchasing the BPO Products, Plaintiff reviewed the accompanying labels and disclosures, and understood them as representations and warranties by the manufacturer that the BPO Products were properly manufactured, free from defects, safe for their intended use, and not adulterated or misbranded. Plaintiff relied on these representations and warranties in deciding to purchase the BPO Products manufactured by Defendants, and these representations and warranties were part of the basis of the bargain. Had Plaintiff known that benzene was contained in the Products at the time of purchase or that the Products degraded to form benzene, Plaintiff would not have purchased and used the Products at all or would have paid significantly less for them. Plaintiff would have never paid a premium for BPO Products that contain the carcinogen benzene.

9.     Plaintiff Tuan Nguyen is a resident and citizen of Fountain Valley, California, located in Orange County. Plaintiff has purchased and used Defendant's Perrigo® brand Benzoyl

Peroxide Acne Treatment Gel 10% BPO regularly since 2018. Plaintiff most recently purchased the BPO Product in 2024 from BT Pharmacy in Westminster, California. When purchasing the BPO Products, Plaintiff reviewed the accompanying labels and disclosures, and understood them as representations and warranties by the manufacturer that the BPO Products were properly manufactured, free from defects, safe for their intended use, and not adulterated or misbranded. Plaintiff relied on these representations and warranties in deciding to purchase the BPO Products manufactured by Defendants, and these representations and warranties were part of the basis of the bargain. Had Plaintiff known that benzene was contained in the Products at the time of purchase or that the Products degraded to form benzene, Plaintiff would not have purchased and used the Products at all or would have paid significantly less for them. Plaintiff would have never paid a premium for BPO Products that contain the carcinogen benzene.

10.     Plaintiff Cole Scroggs is a resident and citizen of Novinger, Missouri, located in Adair County. For the past several years, including from 2020 through 2023, Plaintiff purchased Defendant's Perrigo® brand Benzoyl Peroxide Acne Medication Wash 10% BPO from retail outlets such as Walmart in Missouri and online at Amazon.com. When purchasing the BPO Products, Plaintiff reviewed the accompanying labels and disclosures, and understood them as representations and warranties by the manufacturer that the BPO Products were properly manufactured, free from defects, safe for their intended use, and not adulterated or misbranded. Plaintiff relied on these representations and warranties in deciding to purchase the BPO Products manufactured by Defendants, and these representations and warranties were part of the basis of the bargain. Had Plaintiff known that benzene was contained in the Products at the time of purchase or that the Products degraded to form benzene, Plaintiff would not have purchased and used the Products at all or would have paid significantly less for them. Plaintiff would have

never paid a premium for BPO Products that contain the carcinogen benzene.

11.     Standing is satisfied by alleging economic injury. Here, Plaintiffs suffered economic injury when they spent money to purchase BPO Products they would not otherwise have purchased, or paid less for, absent Defendants' misconduct, as alleged herein. Members of the putative class have likewise suffered economic injuries in that they have spent money to purchase BPO Products they would not otherwise have purchased, or paid less for, absent Defendants' misconduct, as alleged herein.

12.     Defendant Padagis Israel Pharmaceuticals Limited is a corporation organized and existing under the laws of Israel, with its principal place of business at 1 Rakefet Street, Shoham, Israel 6085001. Upon information and belief, Defendant Padagis Israel Pharmaceuticals Limited is a wholly owned subsidiary of Defendant Padagis LLC.

13.     Defendant Padagis US LLC is a Delaware limited liability company. Padagis US LLC's sole member is Padagis Acquisition Holding Company LLC, with a principal place of business at 1251 Lincoln Road, Allegan, Michigan 49010. Padagis Acquisition Holding Company LLC's sole member is Amethyst Cederholm, Executive Vice President and General Counsel of Padagis LLC, whose address is 1251 Lincoln Road, Allegan, Michigan 49010. Thus, Padagis US LLC is a citizen of Michigan.

14.     Defendant Padagis LLC is a Delaware limited liability company. Padagis LLC's sole member is Padagis Acquisition Holding Company LLC, with a principal place of business at 1251 Lincoln Road, Allegan, Michigan 49010. Padagis Acquisition Holding Company LLC's sole member is Amethyst Cederholm, Executive Vice President and General Counsel of Padagis LLC, whose address is 1251 Lincoln Road, Allegan, Michigan 49010. Thus, Padagis LLC is a citizen of Michigan.

15.     Upon information and belief, Padagis LLC directs the operations, management, and activities of Defendants Padagis Israel Pharmaceuticals Ltd. and Padagis US LLC in the United States.

16.     Defendant Perrigo Company PLC is a Delaware corporation with its principal place of business at 515 Eastern Avenue, Allegan, Michigan 49010. Upon information and belief, Parrigo Company PLC is a distributor of the BPO Products, including the specific BPO Products purchased by Plaintiffs.

17.     Upon information and belief, Defendants engage in the manufacture, marketing, distribution and sale of over-the-counter drug products (including the BPO Products at issue) throughout the United States, including in California and Missouri. The BPO Products, including those purchased by Plaintiffs and Class members, are available for sale on third party websites like Amazon (www.amazon.com) and are sold by various retailers such as Walmart, both online and in their brick-and-mortar stores throughout the United States. Defendants authorized the false, misleading, and deceptive marketing, advertising, distribution, and sale of its BPO Products.

**JURISDICTION AND VENUE**

18.     This Court has original jurisdiction over all causes of action asserted herein under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2), because the matter in controversy exceeds the sum or value of $5,000,000 exclusive of interest and costs and is a class action in which there are more than 100 class members and many members of the class are citizens of a state different than Defendant.

19.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391, because Plaintiffs suffered injury as a result of Defendants' acts in this district, many of the acts and transactions

giving rise to this action occurred in this district, Defendants conduct substantial business in this district, Defendants have intentionally availed themselves of the laws and markets of this district, and Defendants are subject to personal jurisdiction in this district.

## FACTUAL ALLEGATIONS

### I.   *Defendants' History in the Industry*

20.    Defendants manufacturer, market, distribute, and/or sell various skin care products, including the BPO Products.

21.    Benzoyl peroxide is an active ingredient in all the BPO Products.

22.    All of Defendants BPO Products are manufactured in the same manner.

23.    All lots of Defendants' BPO Products contain and/or or systematically degrade to form benzene. As noted below, this is supported by testing of 66 acne treatment products containing benzoyl peroxide, all of which tested positive for benzene at various levels ranging from 2,000 ppm to 1.8 ppm. Defendants' Perrigo® Benzoyl Peroxide Acne Treatment Gel 5% BPO, in particular, was tested and found to contain over 14 ppm benzene. These results have been published in peer-reviewed literature.[2]

24.    The rates of degradation and benzene impurities in the BPO Products occur at a systematic rate.

### II.    *Evidence of Benzene's Danger*

25.    Benzene is used primarily as a solvent in the chemical and pharmaceutical industries, as a starting material and intermediate in the synthesis of numerous chemicals, and in gasoline. The major United States source of benzene is petroleum. The health hazards of benzene have been recognized for over one hundred years.

_____

[2] Kucera K, Zenzola N, Hudspeth A, Dubnicka M, Hinz W, Bunick CG, Dabestani A, Light DY. Benzoyl Peroxide Drug Products Form Benzene. Environ Health Perspect. 2024 Mar;132(3):37702. doi: 10.1289/EHP13984. Epub 2024 Mar 14. PMID: 38483533; PMCID: PMC10939128.

26. "Human exposure to benzene has been associated with a range of acute and long-term adverse health effects and diseases, including cancer and haematological effects."[3]

27. A toxicity assessment by the Centers for Disease Control and Prevention has shown benzene can harm the central nervous system and may affect reproductive organs.[4]

28. According to the World Health Organization, "Benzene is a genotoxic carcinogen in humans and no safe level of exposure can be recommended."[5]

29. According to the National Cancer Institute, "[e]xposure to benzene increases the risk of developing leukemia and other blood disorders."[6]

30. According to the National Toxicology Program, benzene is "known to be a human carcinogen based on sufficient evidence of carcinogenicity from studies in humans."[7]

31. Benzene has also been "found to be carcinogenic to humans" by the International Agency for Research on Cancer ("IARC"). Benzene was "[f]irst evaluated by IARC in 1974 . . . and was found to be carcinogenic to humans (Group 1), a finding that has stood since that time."[8] As noted by the IARC:

> In the current evaluation, the Working Group again confirmed the carcinogenicity of benzene based on *sufficient evidence* of carcinogenicity in humans, *sufficient evidence* of carcinogenicity in experimental animals, and *strong* mechanistic evidence. … The Working Group affirmed the strong evidence that benzene is genotoxic, and found that it also exhibits many other key characteristics of carcinogens, including in exposed humans. In particular, benzene is metabolically activated to electrophilic metabolites; induces oxidative stress and associated oxidative damage to DNA; is genotoxic; alters DNA repair or causes genomic instability; is immunosuppressive; alters cell proliferation, cell death, or nutrient supply; and modulates receptor-mediated effects.[9]

32. The FDA also recognizes that "[b]enzene is a carcinogen that can cause cancer in

---

[3] https://www.who.int/publications/i/item/WHO-CED-PHE-EPE-19.4.2.
[4] https://www.atsdr.cdc.gov/toxprofiles/tp3.pdf.
[5] WHO Guidelines for Indoor Air Quality: Selected Pollutants (2010).
[6] https://www.cancer.gov/about-cancer/causes-prevention/risk/substances/benzene.
[7] http://ntp.niehs.nih.gov/go/roc/content/profiles/benzene.pdf (emphasis in original).
[8] Benzene / IARC Working Group on the Evaluation of Carcinogenic Risks to Humans (2017: Lyon, France), at p. 33.
[9] *Id*. at 34.

humans"[10] and classifies benzene as a "Class 1" solvent that should be "avoided" in drug manufacturing.[11] FDA guidance provides: "Solvents in Class 1 [e.g. benzene] should not be employed in the manufacture of drug substances, excipients, and drug products because of [its] unacceptable toxicity."[12]

33.    In July 2021, the FDA conducted a "Health Hazard Evaluation" on "Multiple Aerosol Sunscreen Products" manufactured by Johnson & Johnson.[13] The evaluation was requested following testing which showed benzene levels ranging "from 11.2 to 23.6 ppm" in Johnson & Johnson's aerosol sunscreen products. Specifically, the agency requested "an evaluation of the likelihood and risks associated with using aerosol sunscreens that contain benzene 11.2 to 23.6 ppm," which "levels exceed the guideline value provided by ICH [Q3C][14] and USP[15]" limits, states the report. The evaluation concluded that serious adverse effects, including potential for "life-threatening" issues or "permanent impairment of a body function" were "likely to occur" at exposure levels within that range. In addition, the evaluation stated that "individuals with altered skin absorption (i.e., infants, elderly, broken skin) and individuals who are exposed to benzene from other sources . . . may be at greater risk."

34.    On December 27, 2023, in response to reports of benzene contamination in various drug products, the FDA issued an "Alert," stating: "Drug manufacturers with a risk for benzene contamination should test their drugs accordingly and should not release any drug product batch that contains benzene above 2 ppm[.] … If any drug product batches with benzene above 2 ppm are already in distribution, the manufacturer should contact FDA to discuss the

---

[10] https://www.fda.gov/food/chemicals/questions-and-answers-occurrence-benzene-soft-drinks-and-other-beverages#q1.
[11] https://www.fda.gov/media/71737/download.
[12] *Id.*
[13] https://article.images.consumerreports.org/prod/content/dam/CRO-Images-2021/Health/12Dec/FDA_Benzene_in_Sunscreen_Assessment.
[14] The term "ICH" refers to The International Conference on Harmonization (ICH) Q3C Impurities: Residual Solvents guidance (December 1997), at https://www.fda.gov/media/71736/download?attachment.
[15] The term "USP" refers to United States Pharmacopeia (USP) Residual Solvents, at https://www.uspnf.com/sites/default/files/usp_pdf/EN/USPNF/generalChapter467Current.pdf.

1  voluntary initiation of a recall[.]"[16]

2  35.    "Even in trace amounts, benzene is known to pose a health risk from exposure

3  routes that include inhalation, ingestion, dermal absorption, and skin or eye contact."[17]

4  36.    As with other topically applied products, such as sunscreen, the application of

5  BPO Products specifically increases the absorption rate of benzene through the skin, thereby

6  increasing the risk of harm.[18]  Indeed, "[d]irect exposure of the eyes, skin, or lungs to benzene

7  can cause tissue injury and irritation."[19]  Accordingly, The National Institute for Occupational

8  Safety and Health ("NIOSH") recommends protective equipment be worn by workers exposed or

9  expecting to be exposed to benzene at concentrations of 0.1 ppm and defines "inhalation, skin

10  absorption, ingestion, skin and/or eye contact" as exposure routes or paths.[20]

11  37.    The Environmental Protection Agency ("EPA") similarly recognizes the cancer

12  risks of benzene, noting that "Benzene is classified as a 'known' human carcinogen (Category A)

13  under the Risk Assessment Guidelines of 1986."[21]  "[B]enzene is characterized as a known

14  human carcinogen for all routes of exposure based on convincing human evidence as well as

15  supporting evidence from animal studies."[22]

16  38.    EPA has set 0.0005 ppm as the maximum permissible level of benzene in

17  drinking water, with a stated goal of "zero."[23]

18  39.    In its review of non-cancer adverse health effects of benzene, the EPA cited

---

[16] https://www.fda.gov/drugs/pharmaceutical-quality-resources/fda-alerts-drug-manufacturers-risk-benzene-contamination-certain-drugs.
[17] Hudspeth, A., et al., Independent Sun Care Product Screening for Benzene Contamination, Environmental Health Perspectives, 130:3, Online Publication 29 March 2022.
[18] *Valisure Detects Benzene in Sunscreen*, VALISURE BLOG (May 25, 2021), https://www.valisure.com/blog/valisure-news/valisure-detects-benzene-in-sunscreen/.
[19] *Facts About Benzene*, CENTERS FOR DISEASE CONTROL AND PREVENTION, https://emergency.cdc.gov/agent/benzene/basics/facts.asp.
[20] *NIOSH Pocket Guide to Chemical Hazards - Benzene*, THE NATIONAL INSTITUTE FOR OCCUPATIONAL SAFETY AND HEALTH (NIOSH), https://www.cdc.gov/niosh/npg/npgd0049.html.
[21] https://cfpub.epa.gov/ncea/iris2/chemicallanding.cfm?substance_nmbr=276.
[22] *Id.*
[23] https://www.epa.gov/ground-water-and-drinking-water/national-primary-drinking-water-regulations.

epidemiologic evidence that "support a threshold of benzene hematotoxicity[24] in humans in the 5-19 ppm range[.]"[25]  As noted in the EPA's review, "[c]learly, if a significantly elevated risk of benzene poisoning is an indication of hematotoxicity, then certainly exposures to benzene at 5-19 ppm are hematotoxic."[26]

### III.    Discovery of Benzene in the BPO Products

40.    On March 5, 2024, Valisure LLC ("Valisure") submitted a public citizens petition to the FDA requesting a recall and suspension of sales of benzoyl peroxide from the U.S. market. The petition was based on Valisure's findings that numerous BPO products contained elevated levels of benzene, a known human carcinogen.[27]

41.    "Valisure operates an analytical laboratory that is accredited under International Organization for Standardization ('ISO/IEC') 17025:2017 standards for chemical testing (PJLA Accreditation Number 94238)," and it "is registered with the Drug Enforcement Administration (License # RV0484814)."[28]  As an industry leader in independent chemical testing of medications, Valisure works with large private health care systems like Kaiser Permanente and governmental healthcare systems like the Military Health System through the U.S. Department of Defense.[29]

42.    In its citizens petition, Valisure reported its testing results for benzene in various types of BPO drug products, mostly utilizing gas chromatography and detection by mass

---

[24] The term "hematotoxic" means "poisonous to the blood and to the organs and tissues involved in the production of blood, such as the bone marrow."
https://clinicalinfo.hiv.gov/en/glossary/hematotoxic.
[25] EPA, Toxicological Review of Benzene (Noncancer Effects) (October 2002), at 38.
https://cfpub.epa.gov/ncea/iris/iris_documents/documents/toxreviews/0276tr.pdf.
[26] Id.
[27] https://assets-global.website-
files.com/6215052733f8bb8fea016220/65e8560962ed23f744902a7b_Valisure%20Citizen%20Pe
tition%20on%20Benzene%20in%20Benzoyl%20Peroxide%20Drug%20Products.pdf.
[28] Id.
[29] Valisure Signs Agreement with Department of Defense to Independently Test & Quality Score Drugs. (August 8, 2023). PR Newswire. (https://www.prnewswire.com/newsreleases/valisure-
signs-agreement-with-department-of-defense-to-independently-test--quality-score-
drugs301895301.html).

spectrometry ("GC-MS") instrumentation that allows mass spectral separation and utilizing selected ion chromatograms, along with Selected Ion Flow Tube-Mass Spectrometry ("SIFT-MS") for detection of benzene released into the air around certain BPO products. Valisure also used other orthogonal approaches for confirmation of a few select products.[30]

43.     GC-MS "is generally considered one of the most accurate analyses available."[31] Indeed, the FDA used the same method to test for impurities like benzene in hand sanitizers.[32]

44.     "The GC-MS method described in [Valisure's] petition utilized body temperature (37°C) for oven incubation. 40°C has been previously used for benzene analysis from liquid pharmaceuticals and beverages, and reduced false positive results compared with higher-temperature incubation."[33]

45.     As reported, Valisure analyzed 66 different BPO containing drug products, both prescription and over-the-counter ("OTC") for the presence of benzene. Valisure acquired the products and incubated the products at 50°C[34] for 18 days, with samples measured at day 0, 4, 10, 14, and 18. These BPO containing products represented creams, lotions, gels, washes, liquids, and bars, and included analysis of Defendant's Equate® Beauty Acne Wash 10% BPO cream.[35] As demonstrated below, results from this 50°C stability showed that every one of the 66 products, including Defendants' Perrigo® Benzoyl Peroxide Acne Treatment Gel 5% BPO, contained some level of benzene ranging from a maximum of 2,000 ppm to 1.8 ppm.[36]

46.     Valisure's findings with respect to its benzene testing of the BPO Product has

---

[30] *Id.* at 10.
[31] *GC/MS Analysis*, Element, https://www.element.com/materials-testing-services/chemical-analysis-labs/gcms-analysis-laboratories.
[32] *Direct Injection Gas Chromatography Mass Spectrometry (GC-MS) Method for the Detection of Listed Impurities in Hand Sanitizers*, FDA (Aug. 24, 2020), https://www.fda.gov/media/141501/download.
[33] *Valisure Citizen Petition* at 10-11 (citations omitted).
[34] "50°C (122°F) is not only a reasonable temperature that 'the product may be exposed to during distribution and handling by consumers' but is an accepted incubation temperature used by the pharmaceutical industry for performing accelerated stability studies with a duration of at least 3 months." *Id.* at 18-19 (citations omitted).
[35] *Id.* at 16, 23.
[36] *Id*. at 16-18.

1   been published in peer-reviewed literature.[37]

2   47.   As noted in the chart below, testing conducted on Defendants' Perrigo® Benzoyl

3   Peroxide Acne Treatment Gel 5% BPO, in particular, revealed benzene levels over 14 ppm.[38]



[37] Kucera K, Zenzola N, Hudspeth A, Dubnicka M, Hinz W, Bunick CG, Dabestani A, Light DY. Benzoyl Peroxide Drug Products Form Benzene. Environ Health Perspect. 2024 Mar;132(3):37702. doi: 10.1289/EHP13984. Epub 2024 Mar 14. PMID: 38483533; PMCID: PMC10939128.
[38] *Valisure Citizen Petition* at 16. The Universal Product Code ("UPC") for the test conducted on PanOxyl® Acne Foaming Wash 10% BPO is identified as 303160228551.







///

///

///

///

///

///

///

///

COMPLAINT







///

///

///

///

///

///

///

COMPLAINT

48.     The BPO Products are not designed to contain benzene, and no amount of benzene is acceptable in acne treatment products such as the BPO Products manufactured, distributed, and sold by Defendant. Further, although Defendants lists the ingredients on the BPO Products' labels, Defendants fail to disclose on the Products' labeling or anywhere in its marketing that the BPO Products contain benzene or that the Products can degrade to form benzene.

49.     Despite its knowledge that the BPO Products contain benzene, Defendants have failed to issue a voluntary recall of the BPO Products.

IV.     **Benzene Renders the BPO Products Adulterated, Misbranded, and Illegal to Sell**

50.     The BPO Products are "drugs" used to treat acne (i.e., *acne vulgaris*), formulated with a chemical called benzoyl peroxide, along with other inactive ingredients, to make acne treatment creams, washes, scrubs, and bars. Before being sold to the public, the BPO Products must be made in conformity with current good manufacturing practices and must conform to quality, safety, and purity specifications. Under the FDCA, a drug is adulterated "if it is a drug and the methods used in, or the facilities or controls used for, its manufacture, processing, packaging, or holding do not confirm to or are not operated or administered in conformity with current good manufacturing practice…."[39]

51.     Benzene is restricted by the FDA to 2 ppm where its use in manufacturing "is unavoidable in order to produce a drug product with a significant therapeutic advance."[40] Except in such "limited cases," Class 1 solvents such as benzene should not be employed in the

---

[39] 21 U.S.C. § 351(a)(2)(B).
[40] 2018 ICH Q3C guidance, at p. 5. US FDA, June 2017 (available at https://www.fda.gov/media/71737/download).

manufacture of drug substances or drug products "because of their unacceptable toxicity."[41]
Defendants' BPO Products do not meet this safe harbor exception. This is because the use of
benzene in the manufacture of the BPO Products is not "unavoidable," nor does the use of
benzene in BPO Products provide a "significant therapeutic advance." That is why, in December
2022, the FDA issued a statement alerting manufacturers to the risk of benzene contamination
and warned that any drug product containing more than 2 ppm benzene was adulterated and
should be recalled. This statement was updated on December 27, 2023, and still provides that
drug manufacturers "should not release any drug product batch that contains benzene above 2
ppm," and further provides, "[i]f any drug product batches with benzene above 2 ppm are
already in distribution, the manufacturer should contact FDA to discuss the voluntary initiation
of a recall[.]"[42]

52.     It is therefore illegal under federal law to manufacture and distribute drug
products in the United States that contain benzene above 2 ppm.[43] Hence, within the past three
years alone, the FDA has announced over a dozen recalls of various drug and cosmetic products
identified as containing "low levels" or even "trace levels" of benzene, including certain hand
sanitizers and aerosol drug products like sunscreens and antiperspirants.[44]

---

[41] *Reformulating Drug Products That Contain Carbomers Manufactured With Benzene*;
Guidance for Industry – Final Guidance. US FDA, December 27, 2023 (citing 2018 ICH Q3C
guidance at p. 5) (available at https://www.regulations.gov/document/FDA-2023-D-5408-0002).
[42] https://www.fda.gov/drugs/pharmaceutical-quality-resources/fda-alerts-drug-manufacturers-
risk-benzene-contamination-certain-drugs. The FDA cannot force a drug manufacturer to recall a
contaminated or adulterated drug. https://www.fda.gov/drugs/pharmaceutical-quality-
resources/facts-about-current-good-manufacturing-practice-cgmp ("While FDA cannot force a
company to recall a drug, companies usually will recall voluntarily or at FDA's request").
[43] 21 U.S.C. § 351(a)(2)(B).
[44] https://www.fda.gov/safety/recalls-market-withdrawals-safety-alerts/johnson-johnson-
consumer-inc-issues-voluntary-recall-specific-neutrogenar-and-aveenor-aerosol;
https://www.fda.gov/safety/recalls-market-withdrawals-safety-alerts/edgewell-personal-care-
issues-voluntary-nationwide-recall-banana-boat-hair-scalp-sunscreen-due-0;

53.     It is also illegal to distribute benzene contaminated drug products under California and Missouri law. For example, in Missouri, "[a] drug … shall be deemed to be adulterated: (1) If it consists in whole or part of any filthy, putrid, or decomposed substance; or (2) It has been produced, prepared, packed, or held under insanitary conditions whereby it may have been contaminated with filth, or whereby it may have been rendered injurious to health; or … (6) If [its] purity or quality falls below [] that which it purports or is represented to possess."[45]

54.     Because all of Defendants' BPO Products contain benzene above 2 ppm, the Products (1) consist of a filthy, putrid, and/or decomposed substance (i.e. benzene), (2) have been produced under conditions whereby it is injurious to health (i.e. benzene exposure), (3) have a purity or quality that falls below that which it purports or is represented to possess. As a result, it is illegal under Missouri law for Defendants to distribute any of its BPO Products in the State of Missouri.

55.     As alleged herein, Defendants' BPO Products contain more than 2 ppm benzene and have been distributed to residents of the states of California and Missouri, including Plaintiffs, in violation of Missouri and California law.

56.     The manufacture of any misbranded or adulterated drug is prohibited under federal law[46] and California[47] and Missouri[48] and state law.

57.     The introduction into commerce of any misbranded or adulterated drug is

---

https://www.fda.gov/safety/recalls-market-withdrawals-safety-alerts/pg-issues-voluntary-recall-specific-old-spice-and-secret-aerosol-spray-antiperspirants-and-old-spice#:~:text=The%20Procter%20%26%20Gamble%20Company%20(NYSE,level%20due%20to%20the%20presence.

[45] Mo. Rev. Stat. § 196.095 (1), (2), (6).

[46] 21 U.S.C. §331(g).

[47] Cal. Health & Safety Code § 111250 ("It is unlawful for any person to manufacture, sell, deliver, hold, or offer for sale any drug or device that is adulterated."); Cal. Health & Safety Code § 111330 ("Any drug or device is misbranded it its labeling is false or misleading in any particular.").

[48] Mo. Rev. Stat. § 196.015(1) ("The following acts and the causing thereof within the state of Missouri are hereby prohibited: (1) The manufacture, sale, or delivery, holding or offering for sale any … drug … that is adulterated or misbranded").

similarly prohibited.[49]

58.    The receipt in interstate commerce of any adulterated or misbranded drug is also unlawful.[50]

59.    Among the ways a drug may be adulterated are:

> If it consists in whole or in part of any filthy, putrid, or decomposed substance; or . . . whereby it may have been rendered injurious to health; . . . .[51]

60.    Among the ways a drug may be misbranded include:

> (1)   The dissemination of any false advertisement. [52]
> (2)   The using, on the labeling of any drug or in any advertising related to such drug, of any representation or suggestion that … such drug complies with the provisions of such section.[53]

61.    Defendants could have avoided any potential for benzene contamination in the BPO Products by changing the manufacturing process or raw ingredients, and the BPO Products could have been sold with absolutely no benzene in them. Specifically, BPO as a raw material is known to be thermally stable at purities as high as 75% up to temperatures of 98°C.[54] Valisure also evaluated pure BPO reference powder in its GC-MS analytical system and found no

---

[49]Mo. Rev. Stat. § 196.015(1); Cal. Health & Safety Code § 111305 ("It is unlawful for any person to receive in commerce any drug or device that is adulterated or to deliver or proffer for delivery any drug or device.").

[50]Mo. Rev. Stat. § 196.015(3); Cal. Health & Safety Code § 111305 ("It is unlawful for any person to receive in commerce any drug or device that is adulterated or to deliver or proffer for delivery any drug or device.").

[51] 21 U.S.C. §351(a)(2)(B). *See also* Mo. Rev. Stat. § 196.095(1) ("A drug or device shall be deemed to be adulterated: (1) If it consists in whole or part of any filthy, putrid, or decomposed substance"); Cal. Health & Safety Code § 111250 ("Any drug or device is adulterated if it consists, in whole or in part, of any filthy, putrid, or decomposed substance."); Cal. Health & Safety Code § 111255 ("Any drug or device is adulterated if it has been produced, prepared, packed, or held under conditions whereby it may have been contaminated with filth, or whereby it may have been rendered injurious to health.").

[52] Mo. Rev. Stat. § 196.015(5); Cal. Health & Safety Code § 111330 ("Any drug or device is misbranded if its labeling is false or misleading in any particular.").

[53] Mo. Rev. Stat. § 196.015(11); Cal. Health & Safety Code § 111355(a) ("Any drug is misbranded unless its label bears . . . all of the following information:... (3) For nonprescription drugs, the quantity or proportion of each active ingredient and the established name of each inactive ingredient in accordance with Sections 502(e)(1)(A)(ii) and (iii) of the federal act (21 U.S.C. 352(e)(1)(A)(ii) and (iii)).").

[54] *Valisure Citizens Petition* at 25 (citation omitted).

1    evidence of the instability and formation of benzene seen in formulated final products of BPO

2    containing acne treatments.[55] Thus, if BPO is inherently stable as a pure, crystalline powder, a

3    reformulated product that focuses on substantially reducing or entirely preventing the

4    degradation of BPO into benzene could potentially be developed.[56]

5    62.    The mere presence of benzene in the BPO Products renders the Products

6    adulterated, misbranded, and illegal to sell. As such, the BPO Products have no economic value

7    and are worthless.    Worse, as manufactured, the levels of benzene contained in the BPO

8    Products—over 14 ppm—"render [them] injurious to health" under the conditions of use

9    prescribed in the labeling and advertising.[57]

10    63.    As the FDA's July 2021 Health Hazard Evaluation concluded, serious adverse

11    effects, including potential for "life-threatening" issues or "permanent impairment of a body

12    function" were "likely to occur" at exposure levels of between 11.2 to 23.6 ppm benzene.[58]

13    64.    Similarly, in its review of the non-cancer effects of benzene, the EPA cites to

14    studies in the medical literature which "support a threshold of benzene hematotoxicity in humans

15    in the 5-19 ppm range, in broad agreement with the emerging exposure-response range that is

16    apparent from the epidemiologic studies[.]"[59]

17    65.    Defendants engaged in fraudulent, unfair, deceptive, misleading, and/or unlawful

18    conduct stemming from its misrepresentations and omissions regarding benzene in its BPO

19    Products.

20    66.    If Defendants had disclosed to Plaintiffs and putative Class members that the BPO

21    Products contain benzene or would degrade into benzene, Plaintiffs and putative Class members

22    _____

23    [55] *Id.*
       [56] *See id.* at 25-26.

24    [57] Mo. Rev. Stat. § 196.095(2); *see also* Cal. Health & Safety Code § 111255 ("Any drug or device is adulterated if it has been produced, prepared, packed, or held under conditions whereby

25    it may have been contaminated with filth, or whereby it may have been rendered injurious to health.").

26    [58] https://article.images.consumerreports.org/prod/content/dam/CRO-Images-2021/Health/12Dec/FDA_Benzene_in_Sunscreen_Assessment.

27    [59] EPA, Toxicological Review of Benzene (Noncancer Effects) (October 2002), at 38. https://cfpub.epa.gov/ncea/iris/iris_documents/documents/toxreviews/0276tr.pdf.

28

would not have purchased the BPO Products.

67.     As manufacturers, distributors, and sellers of acne treatment products, Defendants had and have a duty to ensure that their BPO Products did not and do not contain excessive (or any) level of benzene, including through regular testing, especially before injecting the BPO Products into the stream of commerce for consumers to use on their skin.[60] This includes testing of raw materials and finished product batches prior to release to ensure they meet appropriate specifications for identity, strength, quality, and purity.[61] But Defendants made no reasonable effort to test their BPO Products for the presence of benzene or test whether the Products could degrade into benzene over the course of the shelf-life of the Products. Nor did Defendants disclose to Plaintiffs in any advertising or marketing that their BPO Products contained benzene or would degrade into benzene. To the contrary, Defendants represented the BPO Products were of merchantable quality, safe to use as prescribed, complied with federal and state law, and did not contain carcinogens or other impurities such as benzene.

*V.   Defendants' Knowledge, Misrepresentations, Omissions, and Concealment of Material Facts Deceived Plaintiffs and Reasonable Consumers*

68.     It is well known that BPO degrades to benzene when exposed to heat over time. This process was first reported in scientific literature as early as 1936.[62]

69.     The issue of BPO decomposition into benzene has been previously identified and acted upon in industries other than in the acne treatment product industry.

70.     For example, at least one patent application was filed by the chemical company Akzo Nobel N.V. in 1997 which "relates to a method for reducing the rate of free benzene and/or benzene derivative formation in BPO formulations based on organic plasticizers, such as pastes,

---

[60] 21 CFR 211.84; 21 CFR 211.160.
[61] 21 CFR 211.165.
[62] H. Erlenmeyer and W. Schoenauer, *Über die thermische Zersetzung von Di-acyl-peroxyden*, HELU. CHIM. ACTA, 19, 338 (1936), https://onlinelibrary.wiley.com/doi/10.1002/hlca.19360190153.

1    emulsions, suspensions, dispersions and the like."[63]

2        71.    In the polymer manufacturing industry, BPO's decomposition into benzene has

3    been studied and concern was raised specifically regarding the carcinogenic implications of the

4    presence of benzene. In 1994, a paper was published[64] by researchers at Denmark's Department

5    of Environmental Chemistry titled "Formation of benzene by hardeners containing benzoyl

6    peroxide and phthalates" and stated:

7

8        Recently, during the investigation of benzene residues in chemical products
         (Rastogi 1993a),[65] it was observed that the benzene content in benzoyl peroxide

9        containing hardeners of two component repair-sets (fillers, elastomers) were >2 %
         (w/w) [20,000 ppm]. Benzene is carcinogenic (IARC 1982), and its use in

10       consumer and industrial products is generally avoided.

11       72.    The study continues with heating of various BPO-containing products at 34°C,

12   50°C and 80°C, finding substantial benzene formation at elevated temperatures, even exceeding

13   levels found in Valisure's March 2024 public citizens petition. Furthermore, similar to Valisure's

14   results, Rastogi finds that only formulations of BPO are unstable, while BPO alone is relatively

15   stable:

16

17       Even heating of BPO-phthalate mixtures at 50°C produced significant amounts of
         benzene (approximately 0.3% [3,000 ppm]), while no benzene production was
         detected when benzoyl peroxide was heated alone at this temperature (Table 2).[66]

18       73.    The referenced 1993 Rastogi article above, titled "Residues of Benzene in

19   Chemical Products," has also been flagged by the EPA as part of its Health & Environmental

20

21

22

23   _____

24   [63] Borys F. SchafranBryce Milleville (1997). "Reduction of benzene formation in dibenzoyl
     peroxide formulations." Akzo Nobel N.V. Worldwide application, WO1997032845A1.
     (https://patents.google.com/patent/WO1997032845A1/en)

25   [64] Rastogi SC. Formation of benzene by hardeners containing benzoyl peroxide and phthalates.
     *Bull Environ Contam Toxicol*. 1994 Nov;53(5):747-52. doi: 10.1007/BF00196949. PMID:

26   7833612.
     [65] Rastogi, S.C. Residues of benzene in chemical products. Bull. Environ. Contam. Toxicol. 50,

27   794-797 (1993). https://doi.org/10.1007/BF00209940.
     [66] *Id.*

28

Research Online ("HERO") system.[67]

74.     Chemical evidence of carcinogenicity has been reported since at least 1981.[68] Multiple studies in the 1980s were conducted using animal models that suggested carcinogenic potential of benzoyl peroxide, including the use of commercial drug formulations of BPO like that of PanOxyl Gel.[69]

75.     In 1991, FDA posted an amendment to the monograph for OTC topical acne drug products because, "the agency became aware of a 1981 study by Slage, et al. ([FDA Ref. 1) that raised a safety concern regarding benzoyl peroxide as a tumor promoter in mice and a 1984 study by Kurokawa, et al. ([FDA] Ref. 2) that reported benzoyl peroxide to have tumor initiation potential," leading FDA to determine that "further study is necessary to adequately assess the tumorigenic potential of benzoyl peroxide."[70]

76.     By 2010, FDA published a final monograph on benzoyl peroxide along with summarizing results from further studies on the potential carcinogenicity of benzoyl peroxide and actions of the FDA Advisory Committee. This final monograph stated, "The Committee recommended, by a four-to-three vote (with one abstention), that the known safety data regarding the tumor promoting potential of benzoyl peroxide should be communicated to

---

[67] US Environmental Protection Agency. Health & Environmental Research Online (HERO). "Residues of Benzene in Chemical Products." HERO ID 2894703 (http://hero.epa.gov/hero/index.cfm/reference/details/reference__id/2894703).

[68] Slaga TJ, Klein-Szanto AJ, Triplett LL, Yotti LP, Trosko KE. Skin tumor-promoting activity of benzoyl peroxide, a widely used free radical-generating compound. Science. 1981 Aug 28;213(4511):1023-5. doi: 10.1126/science.6791284. PMID: 6791284.

[69] Kurokawa Y, Takamura N, Matsushima Y, Imazawa T, Hayashi Y. *Studies on the promoting and complete carcinogenic activities of some oxidizing chemicals in skin carcinogenesis.* Cancer Lett. 1984 Oct;24(3):299-304. doi: 10.1016/0304-3835(84)90026-0. PMID: 6437666; Pelling JC, Fischer SM, Neades R, Strawhecker J, Schweickert L. *Elevated expression and point mutation of the Ha-ras proto-oncogene in mouse skin tumors promoted by benzoyl peroxide and other promoting agents.* Carcinogenesis. 1987 Oct;8(10):1481-4. doi: 10.1093/carcin/8.10.1481. PMID: 3115617; 81 O'Connell JF, Klein-Szanto AJ, DiGiovanni DM, Fries JW, Slaga TJ. *Enhanced malignant progression of mouse skin tumors by the free-radical generator benzoyl peroxide.* Cancer Res. 1986 Jun;46(6):2863-5. PMID: 3084079; 82 Iversen OH. *Carcinogenesis studies with benzoyl peroxide (Panoxyl gel 5%).* J Invest Dermatol. 1986 Apr;86(4):442-8. doi: 10.1111/1523-1747.ep12285787. PMID: 3091706.

[70] Food and Drug Administration. *Proposed Rule: Reclassifies benzoyl peroxide from GRASE to Category III.* (August 7, 1991) Federal Register, 56FR37622. pp 37622 - 37635 (https://cdn.loc.gov/service/ll/fedreg/fr056/fr056152/fr056152.pdf#page=178).

---

consumers. Because this data was inconclusive, the Committee unanimously agreed that the word, "cancer" should not be included in the labeling of acne drug products containing benzoyl peroxide. The Committee was concerned that the word "cancer" would cause consumers to avoid using these products (even though the data were inconclusive).[71]

77.     In 2020, the FDA started working with companies to identify benzene in products, which resulted in product recalls of hand sanitizers, sunscreens, and deodorants. In 2021, an independent chemical analysis by Valisure of hundreds of sunscreens and after-sun care products from 69 brands found 27% of the batches had significant levels of benzene above 2 ppm.[72]

78.     Thus, by 2021, Defendants were well-aware of benzene contamination issues in their BPO Products and in products of their competitors.

79.     Further, Defendants, which markets themselves as merchandisers of quality acne treatment products that and employs high-level scientists, chemists, and researchers to formulate and/or decide which drug products to label and sell for public use, were aware of the well-known chemical processes that degrade their BPO Products into benzene when exposed to commonly used temperatures and conditions.

80.     Defendants, as large, sophisticated corporations in the business of manufacturing, distributing, and selling products containing BPO, knew or should have known the BPO Products were contaminated with excess levels of benzene and that testing the BPO Products for benzene was necessary to protect Plaintiffs and Class members from harmful levels of benzene exposure.

81.     Defendants' use of BPO put it on notice of the excessive levels of benzene in the BPO Products.

82.     Notwithstanding this knowledge, Defendants failed to appropriately and adequately test their BPO Products for the presence of benzene to protect Plaintiffs and Class

---

[71] Food and Drug Administration. Final Monograph. (March 4, 2010) Federal Register, 75FR9767. (https://www.gpo.gov/fdsys/pkg/FR-2010-03-04/pdf/2010-4424.pdf).
[72] Valisure Citizen Petition on Benzene in Sunscreen and After-sun Care Products, May 24, 2021.

members from dangerous levels of benzene exposure.

83. Defendants sold, and continue to sell, BPO Products during the class period despite their knowledge of the risk of benzene contamination.

84. Benzene is not listed on the BPO Products' labels as an ingredient, nor is there any warning about the inclusion (or even potential inclusion) of benzene in the BPO Products. The following image shows an example:





85.     Plaintiffs have standing to represent members of the putative Class because there is sufficient similarity between the specific BPO Product purchased by Plaintiffs and the other BPO Products not purchased by Plaintiffs. Specifically, each and every one of the BPO Products (i) are marketed in substantially the same way – as an acne treatment— and (ii) fail to include labeling indicating to consumers that the BPO Products contain benzene or degrade into benzene. Accordingly, the misleading effect of all the BPO Products' labels are substantially the same.

86.     Defendants have engaged in deceptive, untrue, and misleading advertising by making representations by failing to warn about the presence of benzene in the BPO Products.

87.     As alleged, the presence of benzene in the BPO Products renders the BPO Products misbranded and adulterated and therefore illegal and unfit for sale in trade or commerce. Plaintiffs would not have purchased the BPO Products had they been truthfully and accurately labeled.

88.     Had Defendants adequately tested its BPO Products for benzene and other carcinogens and impurities, it would have discovered its BPO Products contained benzene – at levels above 2 ppm, making the BPO Products illegal to distribute, market, and sell.

89.     Accordingly, Defendants knowingly, recklessly, or at least negligently, introduced the contaminated, adulterated, and misbranded BPO Products into the U.S. market.

90.     Defendants' concealment was material and intentional because people are concerned with what is contained in the products they are putting onto and into their bodies. Consumers such as Plaintiffs and Class members make purchasing decisions based on the representations made on the BPO Products' labeling, including the ingredients listed.

## VI.   *Injuries to Plaintiffs and Class Members*

91.     When Plaintiffs purchased Defendants' BPO Products, Plaintiffs did not know, and had no reason to know, that Defendants' BPO Products contained or would degrade into the harmful carcinogen benzene. Not only would Plaintiffs not have purchased Defendants' BPO Products had they known the Products contained or would degrade into benzene, but they would

also not have been capable of purchasing them if Defendants had done as the law required and tested the BPO Products for benzene and other carcinogens and impurities.

92.     Consumers lack the ability to test or independently ascertain or verify whether a product contains unsafe substances, such as benzene, especially at the point of sale, and therefore must rely on Defendants to truthfully and honestly report on the BPO Products' packaging and labeling what the Products contain.

93.     Further, given Defendants' position as a leader in the acne treatment market, Plaintiffs and reasonable consumers trusted and relied on Defendants' representations and omissions regarding the presence of benzene in the BPO Products.

94.     Defendants' false and misleading omissions and deceptive misrepresentations regarding the presence of benzene in the BPO Products are likely to continue to deceive and mislead reasonable consumers and the public, as it has already deceived and misled Plaintiffs and the Class members.

95.     Plaintiffs and Class members bargained for products free of contaminants and dangerous substances. Plaintiffs and Class members were injured by the full purchase price of the BPO Products because the Products are worthless, as they are adulterated and contain harmful levels of benzene, and Defendants failed to warn consumers of this fact. Such illegally sold products are worthless and have no value.

96.     As a proximate result thereof, Plaintiffs and Class members are entitled to statutory and punitive damages, attorneys' fees and costs, and any further relief this Court deems just and proper.

97.     All conditions precedent to the prosecution of this action have occurred, and/or have been performed, excused, or otherwise waived.

## CLASS ALLEGATIONS

98.     Plaintiffs, individually and on behalf of all others similarly situated, bring this

class action pursuant to Fed. R. Civ. P. 23.

99.     Plaintiffs seeks to represent classes defined as:

**California Class**

All persons who purchased the BPO Products in the State of
California for personal or household use within the applicable
limitations period.

**Missouri Class**

All persons who purchased the BPO Products in the State of
Missouri for personal or household use within the applicable
limitations period.

100.     Excluded from the Class are: (1) any Judge or Magistrate presiding over this action and any members of their families; (2) Defendants, Defendants' subsidiaries, parents, successors, predecessors, and any entities in which Defendants or their parents and any entities in which Defendants have a controlling interest and their current or former employees, officers, and directors; and (3) individuals who allege personal bodily injury resulting from the use of the BPO Products.

101.     Plaintiffs reserve the right to modify, change, or expand the definitions of the Class based upon discovery and further investigation.

102.     *Numerosity*: The Class is so numerous that joinder of all members is impracticable. The Class likely contains hundreds of thousands of members based on publicly available data. The Class is ascertainable by records in Defendants' possession.

103.     *Commonality*: Questions of law or fact common to the Class include:

a.   Whether the BPO Products contain benzene;

b.   Whether a reasonable consumer would consider the presence of benzene in the
     BPO Products to be material;

c.   Whether Defendants knew or should have known that the BPO Products contains benzene;

d.   Whether Defendants misrepresented that the BPO Products contain or degrade into benzene;

e.   Whether Defendants failed to disclose that the BPO Products contain or degrade into benzene;

f.   Whether Defendants concealed that the BPO Products contain or degrade into benzene;

g.   Whether Defendants engaged in unfair or deceptive trade practices;

h.   Whether Defendants violated the state consumer protection statutes alleged herein;

i.   Whether Defendants were unjustly enriched; and

j.   Whether Plaintiffs and Class members are entitled to damages.

104.   *Typicality*: Plaintiffs' claims are typical of the claims of Class members. Plaintiffs and Class members were injured and suffered damages in substantially the same manner, have the same claims against Defendants relating to the same course of conduct, and are entitled to relief under the same legal theories.

105.   *Adequacy*: Plaintiffs will fairly and adequately protect the interests of the Class and has no interests antagonistic to those of the Class. Plaintiffs have retained counsel experienced in the prosecution of complex class actions, including actions with issues, claims, and defenses similar to the present case. Counsel intends to vigorously prosecute this action.

106.   *Predominance and superiority*: Questions of law or fact common to Class members predominate over any questions affecting individual members. A class action is

superior to other available methods for the fair and efficient adjudication of this case because individual joinder of all Class members is impracticable and the amount at issue for each Class member would not justify the cost of litigating individual claims. Should individual Class members be required to bring separate actions, this Court would be confronted with a multiplicity of lawsuits burdening the court system while also creating the risk of inconsistent rulings and contradictory judgments. In contrast to proceeding on a case-by-case basis, in which inconsistent results will magnify the delay and expense to all parties and the court system, this class action presents far fewer management difficulties while providing unitary adjudication, economies of scale and comprehensive supervision by a single court. Plaintiffs are unaware of any difficulties that are likely to be encountered in the management of this action that would preclude its maintenance as a class action.

107.    Accordingly, this class action may be maintained pursuant to Fed. R. Civ. P. 23(b)(3).

**COUNT I – Violations of the Unfair Competition Law (the "UCL"), Cal. Bus. & Prof. Code § 17200, *Et Seq.***
**(On Behalf of Plaintiffs Daugherty and Nguyen and the California Class)**

108.    Plaintiffs incorporate by reference and re-allege each and every allegation contained above, as though fully set forth herein.

109.    Plaintiffs bring this Count I individually and on behalf of the California Class members against Defendants.

110.    The UCL prohibits any "unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising…." Cal. Bus. & Prof. Code § 17200.

111.    Any business act or practice that is likely to deceive members of the public constitutes a fraudulent business act or practice under the UCL. Similarly, any advertising that is

deceptive, untrue or misleading constitutes a fraudulent business act or practice under the UCL.

112.    Defendants have engaged, and continue to engage, in conduct that is likely to deceive members of the public. This conduct includes representing in their labels that its BPO Products are safe and effective when used as directed, which is untrue, and by failing to make any mention that the BPO Products contain benzene or degrade to form benzene.

113.    By committing the acts alleged above, Defendants have engaged in fraudulent business acts and practices, which constitute unfair competition within the meaning of Business & Professions Code §17200.

114.    Defendants' conduct also violates Cal. Health & Safety Code § 111730, which prohibits the sale of any misbranded product. The BPO Products are "false and misleading in any particular" in violation of Health & Safety Code § 111730 because the labeling for the BPO Products does not mention that the Products contain benzene or degrade to form benzene.

115.    By violating the Cal. Health and Safety Code § 111730, Defendants have engaged in unlawful business acts and practices which constitute unfair competition within the meaning of Cal. Bus. & Prof. Code § 17200.

116.    Any business practice that offends an established public policy or is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers constitutes an "unfair" practice under the UCL.

117.    Defendants have engaged, and continue to engage, in unfair business practices. This conduct includes representing that the BPO do not contain benzene and/or do not degrade into benzene when in fact they do.

118.    Moreover, Defendants' conduct has caused, and continues to cause, substantial injury to consumers because consumers, including Plaintiffs, would not have paid for BPO

Products containing benzene or that degrade into benzene but for Defendants' false labeling, advertising, and promotion. Thus, Plaintiffs and the Class have "lost money or property" as required for UCL standing, and such an injury is not outweighed by any countervailing benefits to consumers or competition.

119.    Indeed, no benefit to consumers or competition results from Defendants' conduct. As alleged, the BPO Products are illegal to sell because of the level of benzene contained in the Products (i.e. over 2 ppm). Moreover, since consumers reasonably rely on Defendants' representation of the ingredients contained in the BPO Products' labels and injury resulted from ordinary use of the BPO Products, consumers could not have reasonably avoided such injury.

120.    By committing the acts described above, Defendants have engaged in unfair business acts and practices which constitute unfair competition within the meaning of the UCL.

121.    As a result of the conduct described above, Defendants have been unjustly enriched at the expense of the Plaintiffs and the putative Class.

122.    An action for injunctive relief and restitution is specifically authorized under Cal. Bus. & Prof. Code 17203.

123.    In accordance with California Business & Professions Code section 17203,[73] Plaintiffs seek an order enjoining Defendants from continuing to conduct business through fraudulent or unlawful acts and practices and to commence a corrective advertising campaign. Defendants' conduct is ongoing and continuing, such that prospective injunctive relief is necessary.

124.    On behalf of Plaintiffs and the Class, Plaintiffs also seek an order for the restitution of all monies spent on the BPO Products, which were acquired through acts of

---

[73] "Any person who engages, has engaged, or proposes to engage in unfair competition may be enjoined in any court of competent jurisdiction." Cal. Bus. & Prof. Code § 17203.

fraudulent, unfair, or unlawful competition.[74] In addition, because the BPO Products contain benzene and/or degrade to form benzene, a known human carcinogen, the measure of restitution should be rescission and full refund insofar as the BPO Products and their associated labels are illegal to sell, and thus, worthless. But for Defendants' misrepresentations and omissions, Plaintiffs would have paid nothing for the BPO Products. Indeed, there is no discernible "market" for an over-the-counter acne treatment product that is adulterated with a known human carcinogen and illegal to sell. As a result, the BPO Products are rendered valueless.

125.   Wherefore, Plaintiffs pray for judgement against Defendants, as set forth hereafter. Defendants' conduct with respect to the labeling, advertising, marketing, and sale of the BPO Products is unfair because Defendant's conduct was immoral, unethical, unscrupulous, or substantially injurious to consumers and the utility of its conduct, if any, does not outweigh the gravity of the harm to its victims.

**COUNT II – Violations of California's False Advertising Law, California Business & Professions Code §§17500, *Et. Seq.***
**(On Behalf of Plaintiff Nguyen and the California Class)**

126.   Plaintiffs incorporate by reference and re-allege each and every allegation contained above, as though fully set forth herein.

127.   Plaintiffs bring this Count II on behalf of the California Class against Defendants.

128.   California's False Advertising Law prohibits any statement in connection with the sale of goods "which is untrue or misleading." Cal. Bus. & Prof. Code §17500.

---

[74] "Actions for relief pursuant to this chapter shall be prosecuted . . . by a person who has suffered injury in fact and lost money or property as a result of the unfair competition." Cal. Bus. & Prof. Code § 17204. "The court may make such orders or judgments . . . as may be necessary to restore to any person in interest any money or property, real or personal, which may have been acquired by means of such unfair competition." Cal. Bus. & Prof. Code § 17203.

129.   As set forth herein, Defendants' labeling represents that their BPO Products are safe and effective to use as directed. Similarly, Defendants claim that their BPO Products' ingredients are safe and effective.

130.   Such claims are false and likely to deceive the public because Defendants' BPO Products contain benzene and/or degrade to form benzene.

131.   Defendants knew, or reasonably should have known, that these claims were untrue or misleading.

132.   Wherefore, Plaintiffs and members of the Class are entitled to injunctive and equitable relief, and restitution in the amount they spent on the BPO Products.

**COUNT III – Violation of the Missouri Merchandising Practices Act, Mo. Rev. Stat. § 407.010, *et seq*.**
**(On Behalf of Plaintiff Scroggs and the Missouri Class)**

133.   Plaintiffs incorporate by reference and re-allege each and every allegation contained above, as though fully set forth herein.

134.   Plaintiffs bring this Count III on behalf of the Missouri Class against Defendants.

135.   The acts and practices engaged in by Defendants, and described herein, constitute unlawful, unfair and/or fraudulent business practices in violation of the Missouri Merchandising Practices Act, Mo. Rev. Stat. § 407.010, *et seq*.

136.   Defendants engaged in unlawful practices including deception, false promises, misrepresentation, and/or the concealment, suppression, or omission of material facts in connection with the sale, distribution or advertisement of the BPO Products, in violation of Mo. Rev. Stat. § 407.020.

137.   Plaintiffs and the Class members purchased the BPO Products, Products that were falsely represented, as stated above, in violation of the Missouri Merchandising Practices Act, and as a result, Plaintiffs and the Class members suffered economic damages in that the BPO

Products were worth less than the product they thought they had purchased had Defendants' representations been true.

**COUNT IV – Fraud/Misrepresentation**
**(On Behalf of all Plaintiffs against Defendants)**

138.    Plaintiffs incorporate by reference and re-allege each and every allegation contained above, as though fully set forth herein.

139.    Plaintiffs bring this Count IV on behalf of the California and Missouri Classes against Defendants.

140.    Defendants intentionally and knowingly falsely concealed, suppressed and/or omitted material facts including as to the standard, quality or grade of the BPO Products.

141.    Due to Defendants' fraudulent conduct, Plaintiffs and the other Class members have suffered actual damages.

142.    Defendants knew or should have known that the BPO Products contain benzene or degrade into benzene when used as directed.

143.    Defendants knew or should have known that their concealment and suppression of material facts was false and misleading and knew the effect of concealing those material facts.

144.    Defendants acted with malice, oppression, and fraud.

145.    Defendants knew or should have known of the dangers associated with benzene in its BPO Products based on regulatory studies and regulatory guidance.

146.    Defendants were obligated to inform Plaintiffs and the other Class members of the dangers associated with benzene in the BPO Products due to their exclusive and superior knowledge of the Products.

147.    Plaintiffs and other Class members also expressly reposed a trust and confidence in Defendants because of their dealings as a healthcare entity and with Plaintiffs and other Class

members as their customers.

148.    Plaintiffs and the other Class members would not have purchased the BPO Products but for Defendants' omissions and concealment of material facts regarding the nature and quality of the Products, or would have paid less for the Products.

149.    Plaintiffs and Class members were justified in relying on Defendants' misrepresentations and/or omissions.

150.    As alleged herein, Plaintiffs and the Class members have suffered injury in fact and lost money as a result of Defendants' conduct because they purchased BPO Products from Defendants in reliance on Defendants' misrepresentation and/or omissions that the BPO Products were safe to use as directed.

151.    Wherefore, as a direct and proximate result thereof, Plaintiffs and members of the Class are entitled to injunctive and equitable relief, and a full refund in the amount they spent on the BPO Products.

**COUNT V – Negligent Misrepresentation**
**(On Behalf of all Plaintiffs against Defendants)**

152.    Plaintiffs incorporate by reference and re-alleges each and every allegation contained above, as though fully set forth herein.

153.    Plaintiffs bring this Count V on behalf of the California and Missouri Classes against Defendants.

154.    Defendants owed a duty of reasonable care to Plaintiffs and the Class members in the labeling, manufacturing, sale, and distribution of its BPO Products.

155.    Defendants also had a duty to exercise reasonable care in properly and accurately representing the safety of its BPO Products to consumers, including Plaintiffs and the Class members.

156.    Defendants failed to exercise ordinary care when making the misrepresentations and/or omissions in their marketing and labeling, claiming that their BPO Products were safe.

157.    Defendants negligently and falsely misrepresented facts regarding the safety of their BPO products to Plaintiffs and the Class members.

158.    Defendants knew or should have known that the misrepresentations regarding the safety of their BPO Products was misleading. Defendants knew or should have known that these misrepresentations would induce Plaintiffs and the Class members to purchase the BPO Products in reliance of Defendants' claims.

159.    As a direct and proximate cause of Defendants' negligent misrepresentations, Plaintiffs and the Class members have suffered harm.

160.    Defendants' misrepresentations were material and substantial factors in Plaintiffs and Class members purchasing and paying for the BPO Products.

161.    Defendants intended, or had reckless disregard, to induce Plaintiffs and Class members to purchase its BPO Products based on its misrepresentations of safety. Plaintiffs and Class members reasonably relied on the misrepresentations made by Defendants.

162.    Wherefore, as a direct and proximate result thereof, Plaintiffs and members of the Class are entitled to injunctive and equitable relief, and a full refund in the amount they spent on the BPO Products.

**COUNT VI – Unjust Enrichment**
**(On Behalf of all Plaintiffs against Defendants)**

163.    Plaintiffs incorporate by reference and re-allege each and every allegation contained above, as though fully set forth herein.

164.    Plaintiffs bring this Count VI on behalf of the California and Missouri Classes against Defendants.

165.     Defendants profited exponentially from their marketing and sale of their benzene-contaminated BPO Products. Plaintiffs and Class members were deprived of the money paid for these defective and unsafe products.

166.     Defendants were unjustly enriched by unlawfully receiving money from Plaintiffs for defective and unsafe products. It would be inequitable and unconscionable for Defendants to retain the compensation obtained based on its wrongful conduct.

167.     Wherefore, as a direct and proximate result thereof, Plaintiffs and members of the Class are entitled to injunctive and equitable relief, and a full refund in the amount they spent on the BPO Products as well as an order from this Court requiring the disgorgement of all profits, benefits, and additional compensation obtained by Defendants by way of their wrongful conduct.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and all others similarly situated, pray for judgment against the Defendants as to each and every count, including:

A.     An order declaring this action to be a proper class action, appointing Plaintiffs and their counsel to represent the Class, and requiring Defendants to bear the costs of class notice;

B.     An order enjoining Defendants from selling the BPO Products;

C.     An order enjoining Defendants from suggesting or implying that the BPO Products are safe for human application;

D.     An order requiring Defendants to engage in a corrective advertising campaign and engage in any further necessary affirmative injunctive relief, such as recalling existing BPO Products;

E.  An order awarding declaratory relief, and any further retrospective or prospective injunctive relief permitted by law or equity, including enjoining Defendants from continuing the unlawful practices alleged herein, and injunctive relief to remedy Defendants' past conduct;

F.  An order requiring Defendants to pay restitution/damages to restore all funds acquired by means of any act or practice declared by this Court to be an unlawful, unfair, or fraudulent business act or practice, untrue or misleading advertising in violation of the above-cited authority, plus pre- and post-judgment interest thereon;

G.  An order requiring Defendants to disgorge any ill-gotten benefits received from Plaintiffs and members of the Class as a result of any wrongful or unlawful act or practice;

H.  An order requiring Defendants to pay all actual and statutory damages permitted under the counts alleged herein;

I.  An order awarding attorneys' fees and costs to Plaintiffs and the Class; and

J.  An order providing for all other such equitable relief as may be just and proper.

**DEMAND FOR JURY TRIAL**

Plaintiffs demand a trial by jury on all issues so triable.

///

///

///

///

///

///

COMPLAINT

1  DATED: April 4, 2024                    Respectfully,

2                                          /s/Mary Liu

3                                          AYLSTOCK, WITKIN,
                                           KREIS & OVERHOLTZ, PLLC
4                                          MARY LIU (282884)
                                           17 East Main Street, Suite 200
5                                          Pensacola, FL 32502
                                           Telephone: 850-202-1010
6                                          Facsimile: 850-916-7449
                                           E-mail: mliu@awkolaw.com
7                                                  cduer@awkolaw.com

8                                          *Attorneys for Plaintiff and others similarly situated*

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28